**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE<br>c/o Engel & Martin, LLC<br>4660 Duke Drive, Suite 101<br>Mason, Ohio 45040, | Case No.  5:17-CV-0787 (GTS/ATB)<br><br>Judge: |
| Plaintiff, | COMPLAINT |
| v. | AND |
| SYRACUSE UNIVERSITY<br>900 South Crouse Ave.<br>Syracuse, NY 13244, | JURY DEMAND |
| Defendant | |

## INTRODUCTION

1. Plaintiff John Doe brings this action for breach of contract, violation of Title IX, and other related claims.

2. This case arises out of the decision of Syracuse University ("Syracuse") to impose disciplinary sanctions against John Doe in violation of the Plaintiff's contractual rights.

## PARTIES

3. Plaintiff John Doe ("Doe") is a former student at Syracuse.

   a. John Doe is a New York resident with a residence at [OMITTED].

   b. Doe has completed 1½ years of coursework at Syracuse.  He needs approximately 67 additional credits to obtain his undergraduate degree.

   c. John Doe has paid a significant amount of money to Syracuse in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

   d.  The disclosure of John Doe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected

1

from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

4. Defendant Syracuse is a private university.

   a. Syracuse was founded in 1870 as a nonsectarian private school, although it maintains a relationship with The United Methodist Church. Syracuse has a current enrollment of over 21,000 students, including approximately 15,000 undergraduates.

   b. Syracuse has a principal place of business at 900 South Crouse Ave., Syracuse, NY 13244

   c. Syracuse voluntarily participates in federal spending programs.

## JURISDICTION AND VENUE

5. This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

## SYRACUSE'S RESPONSE TO THE ISSUE OF SEXUAL MISCONDUCT ON CAMPUSES

7. After years of criticism for being too lax on campus sexual assault, colleges and universities are relying on Title IX to crackdown on alleged perpetrators. Unfortunately, this crackdown has gone too far. Problems include: accused students effectively are presumed guilty; instead of requiring

accusers to prove they were assaulted, the accused students have to prove they had consent; and schools apply the very lowest standard of proof — preponderance of the evidence.

8. On April 11, 2011, the U.S. Education Department's Office of Civil Rights sent a "Dear Colleague" to colleges and universities.

    a. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.

    b. Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt."

    c. The Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

    d. The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

    e. The Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

    f. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

9. The Federal Government, through the Department of Education, Office of Civil Rights, has been pressuring colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

a. The Dear Colleague letter was a step in the increased enforcement of Title IX on college and universities. NPR described the Dear Colleague Letter as the government's "first warning shot."  Source:  *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.

b. The Washington Post reported in March 2015 that the Office of Civil Rights was seeking to hire up to 200 more investigators.

c. In May 2014, the federal Department of Education disclosed for the first time the names of colleges — 55 in all, including Hobart and William Smith — under investigation for possibly violating federal rules aimed at stopping sexual harassment.

d. The Federal government is investigating at least 129 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago and many top state universities.

e. In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change.  According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."  Source:  *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

f. Lhanon was quoted in the LA Times **stating**, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."  David G. Savage and Timothy M. Phelps,  *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

10. Schools, including Syracuse, are scared of being investigated or sanctioned by the Department of Education.

    a. The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

    b. Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014. In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

    c. In June 2014, Lhannon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

    d.  Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it."  Source:  *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

    e.  In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. Source: *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

11.  The change in administrations is unlikely to change the pressure felt by colleges and universities.

    a.  As of the date of this Complaint, the Trump Administration has not withdrawn the guidance in the Dear Colleague Letter.

    b.  One college President was quoted in the Chronicle of Higher Ed. suggesting that the crack-down would continue regardless of actions by the Trump Administration.  Diane Harrison, president of California State University, Northridge, said, "There are rumors that they're going to lessen what we have to do. So we are potentially going to need to be far more assertive and far more vocal."  Chronicle of Higher Ed., *Do Not Step Away*, January 16, 2017 (Available at: https://www.insidehighered.com/news/2017/01/26/college-leaders-discuss-future-

title-ix-sexual-assault-prevention-efforts).  The same article noted, "College presidents . . . were in agreement that they would continue to use the preponderance of evidence standard, even if the 2011 guidance were to be reversed. The majority of colleges were already using the standard prior to the Dear Colleague letter." *Id.*

c.  A separate article in the Chronicle of Higher Ed. noted, "even though colleges are likely to face much less pressure from the federal government, that doesn't mean they'll stop following the letter or the spirit of Title IX." Chronicle of Higher Ed., *Trump Administration May Back Away From Title IX, but Campuses Won't,* Nov. 11, 2016 (available at: http://www.chronicle.com/article/Trump-Administration-May-Back/238382).      The article continues:  "Even though the particular manner of enforcement may change, Title IX will still be law, and regulations written to carry it out will still be obligatory. . . .  It hasn't been just the federal government but campus activists and advocacy groups, as well, that have pushed colleges to pay more attention and devote more resources to stopping sexual assault."

12. In response to pressure from OCR, DOJ, and the White House, educational institutions, like Syracuse, are limiting procedural protections afforded to male students, like John Doe, in sexual misconduct cases.  This is not political speculation.  The Association of Title IX Administrators published "2014 Whitepaper" entitled *Equity is Such a Lonely Word*, includes training materials presented to college Title IX departments and states: "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and ***victims are typically women***, equity may require institutions to recalibrate the pendulum to right the historical imbalance." (emphasis added).

13. In recent years, and during the period preceding the disciplinary actions against John Doe, there was substantial criticism of Syracuse, both in the student body and in the public media, accusing

Syracuse of not taking seriously complaints of female students alleging sexual assault by male students.

    a.  This criticism included criticism of the manner in which Syracuse handled Title IX investigations.

    b.  In September 2014, students, faculty and staff gathered on the steps of Hendricks Chapel at Syracuse to protest the university's changes to sexual assault policies. News reports:

> The protest concluded with about 50 advocates storming the chancellor's office and slapping him with the petition. Initially, staffers told the protesters that the chancellor was not available to speak to students that day, but he eventually emerged from his office after a lot of persuasion from the crowd and told them that he appreciated their efforts and would read the petition.

Source:  USA Today College, *'Rally For Consent' protest aims to alter sexual assault resources at Syracuse*, September 19, 2014 (available at: http://college.usatoday.com/2014/09/19/rally-for-consent-protest-aims-to-alter-sexual-assault-resources-at-syracuse/).

      i.  Approximately 75 people showed up for The "Rally for Consent" on Wednesday, September 17, 2014.

     ii.  In response to these protests, the Chancellor promised changes.  He said, "I've heard very much that people wanted to be consulted about major decisions at the university before they're announced.  As chancellor, I'm committed to that, and I've learned from this experience."  Source:  WRVO, *SU students protest closure of sexual assault advocacy center,* Sept. 18, 2014 (available at: http://wrvo.org/post/su-students-protest-closure-sexual-assault-advocacy-center).

    c.  In November 2014, students have organized to raise awareness to issues facing "marginalized groups" at Syracuse and to protest a decision last summer to close the Advocacy Center, which provided sexual assault prevention education and counseling to

survivors.   Source:   Inside   Higher   Ed   Nov.   4,   2015   (available   at: https://www.insidehighered.com/news/2014/11/05/syracuse-students-sit-demand-changes).   An organization called "THE General Body," a collective of student organizations, spent close to three weeks occupying the Syracuse administration building. Source:   Syracuse   New   Times,   Nov.   24,   2014   (available   at: https://www.syracusenewtimes.com/solidarity-continues-syracuse-university/)

 i. The General Body claimed growing support from faculty and alumni, including letters from faculty members.

 ii. Among the demands from THE General Body were an increase in attention to the issue of sexual assault. The group protested the closure of the Advocacy Center, formerly the Rape Center, described as "a resource for survivors of sexual assault and a community of individuals fighting domestic and sexual violence." The group also complained about:  "The lack of a Yes Means Yes policy. [and] That the [Syracuse] Title IX Coordinator has not gone through extensive enough sexual assault advocacy training."   Source:   https://thegeneralbody.org/grievances-needs/

 iii. A document outlining communications between The General Body and the administration demonstrates a significant focus on the issue of sexual assault on the campus, demonstrating that the Syracuse administration was cognizant of, and sensitive to, these criticisms.  These communications contain specific personal criticism of the Syracuse Title IX Coordinator for her role in prior matters in which the University was seen as not taking seriously the complaints of female students. Source:

https://thegeneralbodydotorg.files.wordpress.com/2014/11/compiled_grievanc es_needs_responses_11_12.pdf.

14. In December 2014, Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy.  (Available at:  http://inclusion.syr.edu/wp-content/uploads/2016/12/Workgroup-Final-Report-Dec-2014.pdf).   The purpose of the Workgroup was to identify critical gaps in services and support for victims and survivors of sexual and relationship violence on campus, and to propose a set of recommendations for improving campus and community culture relating to these matters.

   a.  The report observed that much of the focus of preventing sexual assault at Syracuse is the prevention of acts by males.  The report says, "The discourse on campus about sexual assault and relationship violence typically focuses on male-on-female violence involving students who are fulltime undergraduates, White, and heterosexual."  (Report at 5.)

   b.  The report suggested that Syracuse had "insufficient staff and resources to effectively investigate incidents of sexual assault and relationship violence, and to educate members of the Syracuse University community."  (Report at 5.)

   c.  The Chancellor in particular was subjected to criticism for his role in the closure of the Advocacy Center:  "We planned to ask the Chancellor to issue an apology and appreciate that one was given during the fall semester, although we realize that it was not fully satisfactory to everyone." (Report at 6.)

   d.  The report urged Syracuse to adopt policies that were more victim-centered:  "Examine the interpretation of federal and state regulations about sexual assault and relationship violence in the wake of changing policy landscapes . . . This process should include external legal counsel with expertise and understanding of the needs of victims and survivors." (Report at 8.)

15. In July 2015, New York state Gov. Andrew Cuomo signed into law the "Enough is Enough" legislation to combat sexual assault on college campuses.  Syracuse Chancellor Kent Syverud adopted the "Enough is Enough" legislation in summer 2015, making him the first private college chancellor or president to do so.  Under "Enough is Enough," Syracuse is obligated to notate on the student's transcript if the student is found responsible for committing sexual assault.

16. Syracuse received national attention as a result of a September 2015 CNBC report titled, "One of the most dangerous places for women in America."  Source: http://www.cnbc.com/2015/09/22/college-rape-crisis-in-america-under-fire.html

    a. The report described a sexual assault against a Syracuse student that occurred in 2012.  The alleged sexual assault never led to criminal charges.

    b. The CNBC articles states that students are pressuring Syracuse and other schools.  The article states, "courageous students—both male and female—are continuing to speak out, refusing to be silenced until the crisis stops."

17. In April 2016, Syracuse responded to some of the criticism that it was not taking the problem of sexual assaults on campus seriously.

    a. Syracuse put out a press release noting that the Title IX coordinator had received 143 reports "from students impacted by sexual assault, relationship violence, stalking and harassment" in 2014-2015.  Source: https://news.syr.edu/2016/04/its-on-us-addressing-sexual-assault-and-relationship-violence-44234/ The Press release noted that Syracuse had "hired a new equal opportunity and Title IX investigator, Bernie Jacobson, to support the investigation process."

    b. One Syracuse Dean responded to allegations that Syracuse was not taking the issue seriously by stating, "the university has expelled and suspended students and put students on probation for sexual misconduct."  Source:  Daily Orange, *How sexual assault on college*

11

*campuses is reported differently at Syracuse University versus public institutions*, April 27, 2016 (available at: http://dailyorange.com/2016/04/how-sexual-assault-on-college-campuses-is-reported-differently-at-syracuse-university-versus-public-institutions/).   Syracuse also intended to publish statistics on the number of formal complaints, the outcome and the disciplinary action that was taken.

18. In October 2016, Syracuse students dragged mattresses covered with messages in red tape to protest rape culture on campus.   According to news reports, "Students took turns standing or sitting with mattresses on the quad. The mattresses were marked up with red tape that read 'rapists go here,' 'survivor,' and 'I can hear your silence.'"   Source:   Post-Standard, *SU students protest handling of sexual assault cases with mattresses, red tape*, October 4, 2016 (available at: http://www.syracuse.com/su-news/index.ssf/2016/10/su_students_protest_handling_o.html).

    a.  The protest was based on a similar protest at Columbia University.   About 50 faculty members signed a letter to support the protest.

    b.  The protesters described Syracuse as an "institution that lets perpetrators walk free while survivors, activists, and our families must bear the injustice silently."   Source: Daily Orange,  *Students hold red tape demonstration against sexual assault*, October 4, 2016 (available at:    http://dailyorange.com/2016/10/students-hold-red-tape-demonstration-sexual-assault/).

19. Syracuse has been the subject of at least two investigations by OCR.

    a.  On June 22, 2016 OCR notified Syracuse that OCR was investigating an allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault."   OCR Docket # 02-16-2168. OCR requested a significant amount of data and information from Syracuse

b. On January 17, 2016, OCR notified Syracuse that OCR was investigating a second allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault."  OCR Docket # 02-16-2323.

    i. Although the letter is dated January 17, 2016, Plaintiff believes that the actual date of the OCR letter was in 2017 based on the August 2016 date of the complaint referenced in the letter and contemporaneous media reporting.

    ii. On information and belief, in February 2017, the graduate student at the center of the second OCR investigation withdrew the complaint and the OCR closed the second investigation.

20. Officials from OCR were scheduled to visit Syracuse on January 24, 2017.  Post-Standard, *Feds to visit Syracuse University as part of sexual assault procedures investigation*, January 13, 2017. According to the news report in response to this visit, Syracuse administration officials sought to emphasize their actions in this area to appease OCR.  The article previously cited says, "Campus officials said they have taken 'significant' steps in recent years to prevent sexual and relationship violence."

21. Federal officials hosted two community meetings for students, faculty and staff during their January 2017 visit.  OCR attorneys asked students and faculty during the visit general questions about their opinions on Syracuse's response to sexual assault and discrimination allegations. Source Daily Orange, *Office for Civil Rights attorneys hold first of 2 meetings on Title IX investigation at* SU, Jan. 24, 2017 (available at: http://dailyorange.com/2017/01/office-for-civil-rights-attorneys-hold-first-of-two-meetings-on-title-ix-investigation-at-su/).

22. The relationship between John Doe and Syracuse is governed by the Student Conduct System Handbook.

a. The Student Conduct System Handbook constitutes a contract between students and the school and, in particular, between John Doe and Syracuse.

13

    b.  A copy of the Student Conduct System Handbook is provided to or available to each student.

23. The Student Conduct System Handbook includes the "Student Conduct System Handbook." A copy of the Student Conduct System Handbook is attached as Exhibit A.

24. The Student Conduct System Handbook also contains a section entitled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the "Sexual Misconduct Policy.")

    a.  Students who violate the Sexual Misconduct Policy will be disciplined under the University's Code of Conduct whether or not a criminal prosecution occurs.

    b.  Violations of the Sexual Misconduct Policy may result in counseling, educational sanctions, disciplinary probation, suspension, expulsion, and referral to the proper law enforcement authorities for prosecution.

25. The Sexual Misconduct Policy prohibits, *inter alia* harassment, sexual assault, and relationship violence. The Sexual Misconduct Policy includes the following relevant definitions:

    a.  "Harassment" is defined as "intentional, unwanted and unwelcome words or conduct directed at a specific person that alarms, threatens or causes fear for that person."

    b.  "Sexual assault" is defined "any actual or attempted nonconsensual sexual activity including, but not limited to: sexual intercourse, or sexual touching, committed with coercion, threat, or intimidation (actual or implied) with or without physical force . . ."

    c.   "Stalking" is defined as "intentionally, and for no legitimate purpose, engaging in a course of conduct directed at a person knowing (or should reasonably know) that such conduct is likely to cause reasonable fear of material harm or does cause substantial harm to the other person or that person's family or another party of their acquaintance."

14

    d. "Affirmative consent" is defined as "a knowing, voluntary and mutual decision among all participants to engage in sexual activity."

        i. The Sexual Misconduct Policy further provides, "Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent."

        ii. In regards to intoxication, the Sexual Misconduct Policy states,

           Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol . . . Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

    e. The Sexual Misconduct Policy specifically provides that "Intoxication of the respondent cannot be used as a defense to an alleged incident involving sexual assault."

26. The Sexual Misconduct Policy contains a section referred to as the "Bill of Rights." Under this section, Syracuse students have the following rights:

    a. The right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."

    b. The right to an appeal.

    c. The right to "be accompanied by an advisor of choice who may assist and advise a reporting individual, accused or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process."

        i. The Syracuse states that it specifically prohibits facing allegations of misconduct from being represented by an attorney unless there are also criminal of civil proceedings. The web page, http://studentconduct.syr.edu/processes--

15

sanctions/conduct-process/formal-process.html, states, "No attorney who is not also a full-time member of the Syracuse University or SUNY ESF faculty, staff, or student body will be permitted to participate in the conduct process on behalf of the complainant or the accused student, except where criminal or civil proceedings are also pending."  Further:

### Role of Attorneys

No attorney who is not also a full-time member of the Syracuse University or SUNY ESF faculty, staff, or student body will be permitted to participate in the conduct process on behalf of the complainant or the accused student, except where criminal or civil proceedings are also pending.

When criminal or civil proceedings are pending, both the complainant and the accused student may be advised by an attorney, but the individual parties remain primarily responsible for conducting their own presentations.

Attorneys for the complainant and the accused student, when permitted to participate, are limited to the role of the procedural advisor described in the current Student Conduct System Handbook.

Any attorney who fails to conform his or her behavior to these requirements will be removed from the proceedings and barred from acting as a procedural advisor in future Student Conduct System proceedings. In such circumstances the hearing board will determine whether to proceed with the hearing without the presence of the procedural advisor or to forward the case to the Director of the Office of Student Rights and Responsibilities for resolution before a hearing officer.

 ii. This aspect of the Syracuse Policy appears to be in conflict with the Clery Act.

d. Other aspects of the Bill of Rights suggests that Syracuse has adopted a biased, "victim centered" approach aimed at always believing and supporting the victim without regard to the results of any investigation or adjudicatory process.  This includes rights that apply only to the complainant:

 i. The right to "be treated with dignity and to receive from the institution courteous, fair and respectful health care and counseling services where available."

    ii.   The right to be "free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations."

    iii.   The right to "describe the incident to as few institutional representatives as practicable and not be required to unnecessarily repeat a description of the incident.

    iv.   The right to be "protected from retaliation by the institution, any student, the accused or the respondent and/or their friends, family and acquaintances within the jurisdiction of the institution."

27. The Syracuse web page has a section specifically for "students" regarding Title IX matters. http://inclusion.syr.edu/facultystaff/students/.  This web page describes "rights" of students. The rights do not mention any rights for accused students:

You have the right to–

**Make a Report to:**

- Department of Public Safety (DPS)
- Syracuse Police Department, and/or the
- New York State police;

*Choose not to Report:*

Be protected by Syracuse University from retaliation for reporting an incident; receive assistance and resources from:

- Counseling Center
- Student Assistance or
- Office of Equal Opportunity, Inclusion & Resolution Services
- Other external resources.

A similar section of the web page, titled "rights and responsibilities," http://inclusion.syr.edu/facultystaff/speak-up/, does not mention any rights of accused students:

## *Your Rights & Responsibilities*

**SU Cares, Understands, and is a place of Connection:** *this is about our Syracuse University community and our culture here at the University.*

*Syracuse University's Core Principles: The* University's Code of Ethical Conduct *guides the activities of all faculty, staff, and students. It provides, in part:* **We respect the rights and dignity of all persons and recognize that discrimination or harassment in any form undermines the fundamental principles of the University.**

*We support a respectful environment through our own actions, encourage respectful behavior in others, and* **speak out against hatred and bias.** *We strive to respect the rights of others and while we respect everyone's right to freedom of speech, with those rights comes a responsibility to do so in ways that are appropriate and sensitive to others. We will investigate allegations of bias against any and all members of our community.*

28. The Sexual Misconduct Policy provides for the provision of "accommodations" for those who he Student Conduct System Handbook contains specific, unique, policies for the resolution of claims that a student violated the Sexual Misconduct Policy.

   a. Complaints alleging violations of the Sexual Misconduct Policy are made to the Syracuse Title IX Coordinator.  The alleged victim is referred to as the "complainant." The student against whom the complaint is filed is the "respondent."   The Title IX Coordinator may also file a complaint without the cooperation of the victim(s) in a specific incident.

   b. Syracuse will not delay its investigation pending the completion of a criminal investigation unless requested to do so by the appropriate legal authorities.

   c. Syracuse may grant "interim relief" such as no-contact orders, moving the respondent, changes in living and/or working and/or academic situations, protective escort services, and referrals to counseling prior to the completion of ay investigation.  When a complaint is filed, Syracuse will place a hold on the respondent's academic records until a final resolution of the complaint.

18

d. Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation.

    i. The investigator should meet with both the complainant, respondent, and witnesses to the alleged incident to gather information regarding the facts and circumstances of the incident.

    ii. The investigative report should describe the relevant facts and circumstances learned during the course of the investigation and will contain all of the interviews conducted by the investigator. The report should not include any conclusions regarding responsibility for violations of the Code of Student Conduct.

e. The complainant, respondent and witnesses involved in the case may be advised by an advisor of their choice, including an attorney.  Advisors, including attorneys "have no standing in the University investigation or in the University Student Conduct System proceedings" and may only "provide advice to their respective parties in a quiet non-disruptive manner." Advisors and may not represent or speak for their respective parties.

f. Once the investigation report is complete, both the respondent and the complainant will be given the opportunity to review the report and provide a written response.  However, personal information is redacted from files and complainants and respondents are not permitted to create copies of the files.

29. Allegations of sexual misconduct are adjudicated by a University Conduct Board comprised of trained faculty and staff members, as appointed by the Director of the Office of Student Rights and Responsibilities.

a. Prior to any hearing, the Board reviews the written report and the written responses.

b. The University Conduct Board is comprised of three (3) members who are full-time faculty or staff from Syracuse University. Members of the University Conduct Board are

appointed by the Senior Vice President and Dean of Student Affairs from a pool of at

least ten (10) members recommended by the University community. The University

Conduct Board is advised by the Director of Student Rights and Responsibilities, by the

Associate Director of Student Rights and Responsibilities or an attorney appointed by the

Director of Student Rights and Responsibilities.

c.   Syracuse rules do not require a hearing.  Instead:

At its sole discretion, the University Conduct Board may rely upon the investigator's report for its understanding of the relevant facts, or it may conduct additional witness interviews and/or gather other additional information. The University Conduct Board may also interview the investigator. The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case.

   i.   The Board determines whether it is more likely than not that the respondent

   violated the Code of Student Conduct using the preponderance of the evidence

   standard.

   ii.   Rules of evidence and "criminal standards of proof" do not apply.

   iii.   Once a finding of responsibility is the University Conduct Board may impose

   sanctions up to and including expulsion from the University.

d.   Decisions of the University Conduct Board are confirmed by the Director of Student

Rights and Responsibilities or a designee.

30. Syracuse aspires to conclude the process of investigation and the Board's decision within 60 days

of the original complaint.

31. Appeals of decision of the hearing are considered by the University Appeals Board.

a.   Grounds for appeals are limited to: (i)  new information not reasonably available at the

time of the original hearing, the absence of which can be shown to have had a detrimental

impact on the outcome of the hearing; (ii) procedural error that can be shown to have had

a detrimental impact on the outcome of the hearing; and (iii) errors in the interpretation

of University policy so substantial as to deny either party a fair hearing; and  (iv)  grossly inappropriate sanction having no reasonable relationship to the charges.

b. The University Appeals Board is comprised of three members who are full-time faculty or staff from Syracuse University. Members of the University Appeals Board are appointed by the Senior Vice President and Dean of Student Affairs.

c. The Board may uphold the decision, change lower board decisions, alter sanctions up or down, or return cases to the respective lower board for further process.

d. Decisions of the University Appeals Board, will be final when reviewed and confirmed by the Senior Vice President and Dean of Student Affairs or a designee.

   i. The Senior Vice President and Dean of Student Affairs, or a designee, as appropriate, may interview any participant in an earlier proceeding, change the decision, alter the sanction up or down, or return the case to the University Appeals Board or another hearing board for further process.

   ii. Decisions of the Senior Vice President and Dean of Student Affairs or a designee, are final.

32. The Student Conduct System Handbook guarantees "Fundamental Fairness" to students.  The provision provides:

> β. **FUNDAMENTAL FAIRNESS**
>
> Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists. Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct--as provided in the published procedures of the University's Student Conduct System or other official University publications.

33. Syracuse has a duty under the accreditation standards to provide a disciplinary process that consistent with the liberal values of fairness and due process.

a. Accreditation standards applied to colleges and universities generally require that truthfulness, clarity, and fairness characterize the institution's relations with students and that an institution's educational policies and procedures are equitably applied to all its students.

b. Syracuse is accredited by the Middle States Commission on Higher Education. The accreditation standards applied to the school require that Syracuse's "policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." See *Standards for Accreditation and Requirements of Affiliation*, Thirteenth Edition.

**THE DISCIPLINARY PROCEEDINGS AGAINST JOHN DOE**

34. John Doe was suspended from Syracuse for events that allegedly occurred in the early morning of September 14, 2016 (the "Incident").

a. On this day, John Doe allegedly in sexual activity with another Syracuse student, Jane Roe. Jane Roe alleged that she did not provide adequate consent because she was "incapacitated by alcohol intoxication." Jane Roe further alleged that John Doe caused her bodily injury during their sexual encounter.

b. John Doe denies any misconduct during the Incident. John Doe is 100% innocent of the allegations brought by Jane Roe.

35. Prior to the Incident, John Doe and Jane Roe had engaged in consensual sexual conduct on a number of occasions.

36. On the evening of the Incident, John Doe and Jane Roe exchanged a series of text messages with the goal of meeting at a fraternity party. (Because the Incident was after midnight, John Doe and Jane Roe started communicating on the evening of September 13, 2016.) They met and started kissing at the party. They left the party and went to John Doe's room.

a. One witness observed John Doe and Jane Roe coming back to John Doe's room. This witness told investigators that "neither seemed like they were too drunk to make a decision." Another witness said that they were "both . . . intoxicated but not to he degree of being unable to stand or speak; they weren't stumbling."

b. John Doe and Jane Roe engaged in sexual intercourse in John Doe's room. The sex was "rough" but consensual. John Doe described Jane Roe as "aggressive" and "pulling me in hard." The two fell asleep but wok between four and five in the morning, when they engaged in consensual sex for a second time.

c. Jane Roe told investigators that she did not remember much of the sexual encounter in the room. She said that John Doe bit her lip when they were making out. She also said that at one point she called him by a different mans' name. She said that made him "mad" but that his reaction was to "pull[] away" and say, "really, are you serious? That's so not cool."

d. John Doe woke about 7 am. John Doe claims that he said that he had an 8:00 class and need to take a shower. Jane Roe claims that John Doe became upset because he (in her view) believed that she had urinated in the bed. Jane Roe claims that John Doe yelled at her. John Doe denied these allegations; John Doe told a witness, "I don't know what happened but my bed is soaked."

37. Jane Roe told investigators that she did not remember much of what happened in John Doe's room. She said that she awoke with a swollen lip and bruises on her chest. Approximately 34 hours after the Incident, she saw a medical provider who observed bruises on her chest. However, Jane Roe also posted some Instagram photographs that did not show any bruising.

38. On October 12, 2016, John Doe was notified by the Assistant Dean/Director of the Office of Student Rights and Responsibilities that Jane Roe had submitted a complaint.

23

39. The investigative report was completed on December 6, 2016.

   a. The report attempted to estimate the blood-alcohol level ("BAC") of the complainant based on the amount of alcohol alleged consumed over a certain period of time.  The investigators do not have any training in forensic medicine but, instead, relied upon a web page called the "Drink Wheel."  (www.intox.com/drinkwheel.)

   b. Significant evidence in the report supported the statements of John Doe

      i. The report acknowledges that the "Complainant's description of events in Respondents room is 'splotchy.'"

      ii. The report indicates that witnesses described Jane Roe as "drunk but able to walk in a straight line and talk without slurring her speech."

      iii. The report indicates that even Jane Roe did not believe that John Doe had committed sexual misconduct:

         Complainant initially reported the encounter as intimate partner violence and not sexual assault . . .  Complainant's characterization of the encounter notwithstanding, the actions she described during both interviews with Investigator objectively rendered uncertain whether she gave effective, affirmative consent to engage in sexual intercourse.

      iv. Jane Roe alleged that John Doe had physically assaulted another student during a sexual encounter.  However, this student told the investigators that the alleged physical assault was merely a "hickey" and that she had never been physically or sexually assaulted by" John Doe.

   c. The report included excerpts from text messages sent/received by Jane Roe.  The report also included statements from witnesses who provided a significant amount of hearsay information.

   d. The report contains a "credibility assessment."

     i. The report suggests that Jane Roe "presented as genuine and sincere" and that she was "visibly, appropriately, upset trying to recall the events." The report found that "no motive or bias was detected." The report suggests that Jane Roe's "description of events is largely corroborated by the available evidence.

     ii. The report suggests that John Doe's "description of events was plausible and largely consistent with the available evidence." The report discounted his testimony because he has "a natural bias, as a named respondent, to present information in a light most favorable to himself." However, the report concluded that "he is assessed as credible."

40. The Office of Student Rights and Responsibilities instructed John Doe to not have any contact with Jane Roe.

    a. This order was put in place prior to any investigation, and only restricted the conduct of John Doe.

    b. Jane Roe attempted to use the No Contact Order to punish John Doe by restricting him from his usual day-to-day activities. For example, in November 2016, Jane Roe alleged that John Doe violated this Order by eating in the same dining hall. There was no communication, only "eye contact." Jane Roe told the Office of Student Rights and Responsibilities that she felt "uncomfortable" and was upset that that she had to leave while [John Doe] got to sit and enjoy a meal with his friends." An employee of the Office of Student Rights and Responsibilities observed that this did not "necessarily appear to be [an] intentional violation," but John Doe was still subsequently prohibited to entering the dining center.

41. The University Conduct Board had a hearing on January 20, 2017. At the hearing John Doe was permitted to tell his side of the story, but never had an opportunity to confront adverse witnesses, including Jane Roe.

42. On January 26, 2017, John Doe was informed that the University Conduct Board had found him responsible for a violation of the Syracuse Code of Conduct.

   a. The University Conduct Board recommended that he be expelled from the Syracuse.

   b. The University Conduct Board made findings of fact:

      i. The Board found that "both parties were intoxicated to the point where their judgment would be impacted."

      ii. The Board found that John Doe "engaged in sexual intercourse with [Jane Roe] twice during the course of the" Incident.

   c. Although the Board found that both John Doe and Jane Roe were too intoxicated to provide consent, the Board only recommended that John Doe receive discipline.

   d. The Board recognized the broader context of its decision. The Board observed that this "is not the first or last occasion on which the University will be compelled to respond to issues of this nature"

43. On January 31, 2017 John Doe submitted an appeal to Syracuse.

44. On February 14, 2017 Syracuse denied John Doe's appeal.

45. Expulsion from Syracuse has caused John Doe to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

## COUNT I
## (TITLE IX)

46. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

47. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

48. Syracuse is an education program or activity operated by recipients of Federal financial assistance.

49. Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

50. The decisions of the hearing process and the appeal process for John Doe were erroneous outcomes which were the direct result of a flawed and biased proceeding. In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.  Syracuse has reversed this process and assumed that John Doe was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

51. Syracuse committed impermissible gender bias against John Doe in the investigation and adjudication of Jane Roe's accusations.

    a. There has been substantial criticism of Syracuse, both in the student body and in the public media (including the Internet), accusing schools of not taking seriously complaints of female students alleging sexual assault by male students.  On information and belief, Syracuse's administration was cognizant of, and sensitive to, these criticisms.  As a result, Syracuse's decision-makers and its investigators were motivated to favor the accusing

27

female over the accused male, to protect themselves and Syracuse from accusations that they had failed to protect female students from sexual assault.

b. On information and belief, Syracuse was motivated in this instance to accept the female's accusation of sexual assault to show the student body and the public that the University is serious about protecting female students from sexual assault by male student. The investigators, hearing panel, and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid the criticism that Syracuse turned a blind eye to such assaults by men.

52. Syracuse has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for Syracuse's actions in this case. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

a. Syracuse, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

b. Syracuse has applied flawed or incorrect legal standards, employed biased or negligent investigatory techniques.

c. Syracuse officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on John Doe is the result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at Syracuse.

53. The circumstances of the Investigatory process, the hearing process, and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding. The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

54. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

   a. A general atmosphere at Syracuse where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on Syracuse from OCR, DOJ, student groups, and public opinion.

   b. The adjudication of the claims against John Doe occurred at the exact time that OCR officials were visiting Syracuse.

   c. The failure of Syracuse to conduct full and fair investigations.

   d. The failure of Syracuse to afford accused students counsel or the opportunity to present evidence in their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

   e. The Sexual Misconduct Policy denies male students, like John Doe, the basic guarantees of fundamental fairness in hearings. These rights include an impartial decision-maker, the assistance of counsel, the right to remain silent in the face of criminal accusations, and the presumption of innocence.

55. The Sexual Misconduct Policy ambiguously prohibits students from engaging in sexual intercourse with any other person that has consumed any amount of alcohol. However, in this instance, Syracuse applied this prohibition in a gender discriminatory manner.

   a. The Hearing Panel concluded that *both* John Doe and Jane Roe were too intoxicated to meaningfully consent to sexual activity. Even though both students engaged in sexual activity, only John Doe was subject to discipline.

   b. Syracuse assumed that Jane Roe, as an alleged female victim, was truthful. As a result of this gender bias, Syracuse failed to adequately investigate and question Jane Roe's credibility, limited questions to and commentary of investigatory findings to Jane Roe's

emotional state and interactions with friends and family in the days and weeks after the alleged incident, and failed to examine many of the blatant contradictions in Jane Roe's statements.

c. Syracuse has, by imposing discipline only on John Doe when it believed both John Doe and Jane Roe were too intoxicated to engage in consensual sexual conduct, incorporated a chauvinistic view of men as "predators" and women as the "guardians" of virtue.

   i. Syracuse's practices and procedures appear to not necessarily be hostile to men, but can be seen as biased in favor of unfairly protecting "vulnerable" and "virtuous" females.

   ii. Although both John Doe and Jane Roe had been drinking, Syracuse identified John Doe as the initiator of sexual activity, notwithstanding the comparable intoxication of both participants.

56. Syracuse has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for Syracuse's actions in this case. Syracuse officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct.

57. John Doe has been deprived of access to educational opportunities at Syracuse.

58. As a direct and proximate result of Syracuse's violations of John Doe's rights under Title IX, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

59. Syracuse is liable to John Doe for his damages.

60. Pursuant to 42 U.S.C. §1988, John Doe is entitled to their attorney's fees incurred in bringing this action.

## COUNT III
## (BREACH OF CONTRACT)

61. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

62. By enrolling at Syracuse, and paying his tuition and fees, and attending the school, John Doe and Syracuse had a relationship that may reasonably be construed as being contractual in nature.

63. The terms of the contract between John Doe and Syracuse are generally found in various Colleges policies and procedures, including those set forth in the Student Conduct System Handbook .

64. The contract between John Doe and Syracuse, as set forth in the Student Conduct System Handbook, contains the following guarantee of essential fairness: "Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct."

65. The contract between John Doe and Syracuse, as set forth in the Student Conduct System Handbook, contains the following guarantee of essential fairness: "All Students have the right to . . . Participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."

66. The contract between John Doe and Syracuse contains an implied covenant of good faith and fair dealing.  This implied covenant prohibits Syracuse from doing anything which will have the effect of destroying or injuring the right of John Doe to receive the fruits of the contract. The contract between John Doe and Syracuse, as a result, impliedly included the requirement that Syracuse provide John Doe with an investigatory and adjudicatory process that was "essentially fair."

67. John Doe paid Syracuse tuition and fees.

68. Syracuse repeatedly and materially breached the explicit guarantee of fundamental fairness and as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

   a. Syracuse breached the explicit and implied obligation to provide John Doe with adequate notice of the nature of the charges against him.  The Student Conduct System Handbook provides: "Students have the right to written notice."  The Bill of Rights within the Student Conduct System Handbook further provides, "All students have the right to: . . . Participate in a process that is fair, impartial, and provides adequate notice . . ."

      i. The information he was initially provided merely stated that a "complaint of relationship violence" had been filed by Jane Roe against John Doe.

      ii. Adequate notice was necessary to permit John Doe to adequately defend himself through the entire disciplinary process, including the investigative stage.

   b. Syracuse breached the implied obligation to perform a threshold evaluation of the allegations before starting an investigation.

      i. This threshold evaluation is necessary to avoid imposing an undue burden upon the accused.

      ii. Had Syracuse performed a reasonable threshold inquiry, this matter would not have been investigated any further.  This is because the allegations against John Doe were brought months after the alleged incident, involved an incident where Jane Roe admitted they had engage in consensual sexual conduct, and were not supported by any physical evidence.

   c. Syracuse breached the explicit and implied obligation to conduct a full and fair investigation of the claims against John Doe.  The Student Conduct System Handbook

32

provides, "Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation."

    i. Syracuse's breach of its obligations to conduct the required investigation began when the Complainant filed.

    ii. On information and belief, the investigator had no real-world experience in, or training about, investigations into allegations sexual assault.

    iii. Syracuse's investigation was not an in investigation but, instead merely stenography. The investigator failed to conduct follow-up interviews or gather relevant physical evidence or information.

    iv. The investigator relied on unreliable information found on the Internet instead of an expert or person with specialized knowledge to calculate whether Jane Roe was intoxicated.

    v. The investigator failed to determine what, if any, benefits or accommodations Jane Roe received as a result of her claim to be a victim of sexual assault. This information was relevant and essential to the assessment of Jane Roe's credibility.

    vi. The failure to conduct a full and fair investigation was a breach of the guarantee of an investigation and the implied covenant of good faith and fair dealing.

d. Syracuse was required to conduct a full and fair hearing before an unbiased hearing panel. The failure to conduct a full and fair investigation is significant because the hearing panel received copies of the investigative report.

e. Syracuse breached its express and implied obligations when it found John Doe Responsible without sufficient evidence.

    i. The Student Conduct System Handbook includes the express statement that a student be found "guilty" by the preponderance of the evidence.

    ii.  There was no physical evidence or witness to support the allegations that John Doe was guilty.

    iii.  The only live witness presented against John Doe was Jane Roe, who was not a witness a reasonably prudent fact-finder would rely upon.

    iv.  The failure to require that John Doe be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

69. The conduct of entire process treated John Doe as if he was guilty from the start, thereby tainting the investigative hearing process and violating the guarantees of fundamental fairness and a fair and impartial hearing.

    a.  Syracuse administrators acted from the beginning as someone who "believed" the Complainant without conducting any investigation.

    b.  John Doe was prohibited from confronting his accuser.

    c.  The bias of the entire process was so pervasive throughout the pre-hearing and hearing processes that it destroyed any possibility of fairness and ensured that John would be found guilty.  The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process.

    d.  The failure to conduct an unbiased hearing was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

70. As a direct and foreseeable result of Syracuse's failure to honor its express and implied contractual promises and representations, John Doe has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress;

injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT III
## (NEGLIGENCE)

71. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

72. Having put in place a student disciplinary process, Syracuse owed a duty of care to John Doe and others to conduct that process in a non-negligent manner and with due care.  Syracuse officials who directed and implemented that process owed John Doe the same duty of care.  Syracuse is responsible for the conduct of those acting on its behalf under the theory of *respondeat superior*.

73. The obligation of Syracuse included to obligation to conduct an investigation and adjudicatory process in a non-negligent manner.

   a. This duty is imposed by the contractual and/or quasi-contractual relationship between the parties.

   b. This duty is further imposed by the role of Syracuse in providing an education consistent with the liberal values of fairness and due process.

74. The relevant standard is set by the accreditation standards applied to Syracuse

   a. Accreditation standards applied to Syracuse and universities generally require that truthfulness, clarity, and fairness characterize the institution's relations with students and that an institution's educational policies and procedures are equitably applied to all its students.

   b. Syracuse is accredited by the Middle States Commission on Higher Education. The accreditation standards applied to the school require that Syracuse' "policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." *See Standards for Accreditation and Requirements of Affiliation, Thirteenth Edition.*

75. The conduct of Syracuse in conducting an investigation fell below the applicable standard of care for conducting investigations into, and adjudicating allegations of, sexual misconduct and amounted to breaches of the duty of due care.  This negligent conduct included, but was not limited to:

    a.  The investigator retained by Syracuse had insufficient experience in the investigation of allegations of sexual assault and had previously expressed a bias in favor of alleged victims. On information and belief, the investigator never worked as a prosecutor or law enforcement officer.

    b.  The investigator failed to inquire about the accommodations received by Jane Roe even though these accommodations would have had a significant effect on her credibility.

    c.  The investigator failed to obtain significant and important physical or documentary evidence, including hospital records and cell phone records.

76. The conduct of Syracuse in holding a hearing fell below the applicable standard of care and amounted to breaches of the duty of due care.  As described above, Syracuse used a biased process and hearing panel.

77. As a direct and proximate result of Syracuse's negligence, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

***Wherefore***, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Doe awarding damages in an amount to be determined at trial;
- An Injunction restoring John Doe as a student and prohibiting further disciplinary proceedings in a manner that violates Title IX or the contract between the parties.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,


    /s/ Catherine Josh

Catherine H. Josh, Esq. (5025036)
45 Exchange Boulevard, Suite 915
Rochester, NY 14614
585-423-1974
585-325-6075 (fax)
chjesq@gmail.com

Joshua Adam Engel (0075769)
*pro hac vice motion to be filed*
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com