**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN DOE,**

         **Plaintiff,**

    **v.**                        **Case No. 5:17-cv-787**

**SYRACUSE UNIVERSITY,**

         **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

### I.   INTRODUCTION

Plaintiff, identified by the pseudonym John Doe, is a male and former student enrolled at Defendant Syracuse University ("Syracuse" or "the University").  He was expelled from the University after having been found to have engaged in nonconsensual sexual intercourse with his classmate, Jane Roe.  Plaintiff brings suit against Syracuse alleging that the University's disciplinary process and expulsion of him violated federal and state law.  He asserts the following claims: (1) a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 _et seq_. ("Title IX")(Count I); (2) breach of contract (Count II[1]); and (3) negligence (Count III).  Presently before the Court is Syracuse's motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint for failure to state

_____

[1]Plaintiff's breach of contract claim and his negligence claims are both titled as "Count III." For purposes of this motion, the Court treats the breach of contract claim as "Count II."

1

claims upon which relief can be granted.  Dkt. # 15.  For the reasons set forth below, the motion is granted in part and denied in part.  Specifically, Syracuse's motion is denied with respect to Plaintiff's Title IX claims (Count I) and granted with respect to Plaintiff's state law claims (Counts II and III).

## II.    STANDARD OF REVIEW

On a Fed. R. Civ. P. 12(b)(6) motion, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).  This tenet does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements ... are not entitled to the assumption of truth." *Id.; see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at  678 (quoting *Twombly*, 550 U.S. at  570).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short

of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Plausibility is "a standard lower than probability." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).  "[A] given set of actions may well be subject to diverging interpretations, each of which is plausible," and "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Id.*  A court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds that a different version is more plausible." *Id.* at 185.  "The role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed."  *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016).

## III.    BACKGROUND

The following facts are taken from the Complaint and assumed to be true for purposes of this motion.

### A. National Controversy Concerning Sexual Assaults on College Campuses

In April 2011, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a "Dear Colleague Letter" to colleges and universities in order to explain its interpretation of Title IX. Compl. Dkt. # 1 at ¶¶ 8–10. The Dear Colleague Letter instructed colleges and universities that compliance with Title IX requires transparent and prompt procedures to investigate and resolve complaints of sexual misconduct. *Id.* at ¶ 8(a).  The

Dear Colleague Letter required colleges and universities to employ a "more likely than not" standard of proof in sexual misconduct cases; this standard was less exacting than the "clear and convincing" or "beyond a reasonable doubt" standards utilized at some colleges. *Id.* at ¶ 8(b). It also instructed universities that they should "minimize the burden on the complainant," "focus more on victim advocacy," and allow both parties the right to appeal a decision, which, according to Plaintiff, "amounts to double jeopardy for an accused student." *Id.* at ¶ 8(c)–(e). Many colleges changed their sexual misconduct policies and procedures after the Dear Colleague Letter was issued. *Id.* at ¶ 8(f)). In addition to the Dear Colleague Letter, the federal government pressured colleges to aggressively investigate sexual assaults through its own investigations of universities and potential lawsuits. *Id.* at ¶ 9. As of May 2014, the U.S. Department of Education was investigating at least 129 colleges for possible Title IX violations. *Id.* at ¶ 9(d). "Schools, including Syracuse, are scared of being investigated or sanctioned by the Department of Education." *Id.* ¶ 10. In July 2016, then-Vice President Joseph Biden suggested that schools that do not comply with Title IX administration guidelines could be stripped of federal funding. *Id.* ¶ 10(e). According to Plaintiff, "[i]n response to pressure from OCR, [the Department of Justice ("DOJ")], and the White House, educational institutions like Syracuse are limiting procedural protections afforded to male students, like [Plaintiff], in sexual misconduct cases." *Id.* at ¶ 12; *see also id.* at ¶ 10(a) ("The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.").

**B. Syracuse's Crackdown Amid Public and OCR Pressure**

In recent years, and during the period preceding the disciplinary action against John Doe, there was substantial criticism of Syracuse, both in the student body and in the public media, accusing Syracuse of not taking seriously complaints by female students alleging sexual assault by male students.  *Id.* at ¶¶13-18.  In September 2014, students, faculty and staff gathered on the steps of Hendricks Chapel at Syracuse to protest the University's changes to sexual assault policies.  An organization called "THE General Body," a collective of student organizations, spent close to three weeks occupying the Syracuse administration building.  Among the demands from THE General Body were an increase in attention to the issue of sexual assault. *Id.* ¶13(c).  In December 2014, Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy.  *Id.* ¶ 14.  The report observed that much of the focus of preventing sexual assault at Syracuse is the prevention of acts by males. *Id.* ¶14(a).  The report says: "The discourse on campus about sexual assault and relationship violence typically focuses on male-on-female violence involving students who are fulltime undergraduates, White, and heterosexual." *Id.*  In July 2015, New York State Gov.  Andrew Cuomo signed into law the "Enough is Enough" legislation to combat sexual assault on college campuses. *Id.* ¶ 15.  Syracuse Chancellor Kent Syverud adopted the "Enough is Enough" legislation in summer 2015, making him the first private college chancellor or president to do so. *Id.*

Syracuse received national attention as a result of a September 2015 CNBC report titled, "One of the most dangerous places for women in America." *Id.* ¶ 16.  In 2016, Syracuse responded to some of the criticism that it was not taking the problem of sexual assaults on campus seriously.  *Id.* ¶ 17.  One Syracuse Dean responded to such allegations

by stating, "the university has expelled and suspended students and put students on probation for sexual misconduct." *Id.* ¶ 17(b).  In October 2016, Syracuse students dragged mattresses covered with messages in red tape to protest rape culture on campus. *Id.* ¶ 18. The protesters described Syracuse as an "institution that lets perpetrators walk free while survivors, activists, and our families must bear the injustice silently." *Id.* ¶ 18(b).

Syracuse has been the subject of at least two investigations by OCR into how the school responded to allegations of sexual assault.  *Id.* ¶ 19.  On June 22, 2016, OCR notified Syracuse that it was investigating an allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault." *Id.* ¶ 19(a).  In connection with this investigation, OCR requested a significant amount of data and information from Syracuse. *Id.*  On January 17, 2017,[2] OCR notified Syracuse that it was investigating a second allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault." *Id.* ¶ 19(b).  Officials from OCR were scheduled to visit Syracuse on January 24, 2017.  *Id.* ¶ 20.   According to the news report in response to this visit, Syracuse administration officials sought to emphasize their actions in this area to appease OCR.  *Id.*

### C. The Syracuse Policies

Plaintiff contends that the relationship between John Doe and Syracuse is governed by the Student Conduct System Handbook. *Id.* ¶ 22.  Plaintiff also contends  that the Student Conduct System Handbook constitutes a contract between students and the school and, in particular, between John Doe and Syracuse. *Id.*  ¶ 22(a).   The Syracuse Student

---

[2]Plaintiff alleges in the Complaint that "[a]lthough the letter is dated January 17, 2016, Plaintiff believes that the actual date of the OCR letter was in 2017 based on the August 2016 date of the complaint referenced in the letter and contemporaneous media reporting."  Compl. ¶ 19(b)(i).

Conduct System Handbook, attached to the Complaint as Exhibit A, contains a section entitled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the "Sexual Misconduct Policy.").  *Id.*  ¶ 24.  This provides that students who violate the Sexual Misconduct Policy will be disciplined under the University's Code of Conduct whether or not a criminal prosecution occurs, and that violations of this policy may result in counseling, educational sanctions, disciplinary probation, suspension, expulsion, and referral to the proper law enforcement authorities for prosecution. *Id.* ¶ 24(a-b).  The Sexual Misconduct Policy prohibits, *inter alia,* harassment, sexual assault, and relationship violence.  *Id.* ¶ 25.  "Sexual assault" is defined as "any actual or attempted nonconsensual sexual activity including, but not limited to: sexual intercourse, or sexual touching, committed with coercion, threat, or intimidation (actual or implied) with or without physical force . . ." *Id.* ¶ 25(b).  Affirmative consent is required in order for the act to be considered consensual.  In order for affirmative consent to be established, there must be proof of "a knowing, voluntary and mutual decision among all participants to engage in sexual activity . . . . The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression."  Dkt. 1-1, at p. 9.  The Sexual Misconduct Policy further provides: "Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent." Compl. ¶ 25(d)(i).  In regards to intoxication, the Sexual Misconduct Policy states:

> Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol . . . Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of

consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

*Id.* ¶ 25(d)(ii).  The Sexual Misconduct Policy specifically provides that "[i]ntoxication of the respondent cannot be used as a defense to an alleged incident involving sexual assault." *Id.* ¶ 25(e).

The Sexual Misconduct Policy contains a section referred to as the "Bill of Rights." Under this section, Syracuse students have the right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard." *Id.* ¶ 26(a).  The Student Conduct System Handbook explicitly guarantees "Fundamental Fairness" to students. *Id.* ¶ 32.  Plaintiff alleges that, in addition to this explicit obligation, Syracuse has a duty under applicable accreditation standards to provide a disciplinary process that is consistent with the liberal values of fairness and due process. *Id.* ¶ 33. The accreditation standards applied to the school require that Syracuse's "policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." *Id.*  ¶33(b)(citing Middle States Commission on Higher Education, Standards for Accreditation and Requirements of Affiliation, Thirteenth Edition).

### D.  Process for Investigation and Review of Sexual Misconduct Complaints

Attached to the Complaint are the University's Student Conduct System Procedures (the "Syracuse Procedures"), which govern the process to be followed upon receipt of an allegation of sexual misconduct. *See* Dkt. # 1-1 at 24-39. The initial step taken in response to a sexual misconduct/sexual violence complaint involves the designation by the University's Title IX Coordinator of a trained Title IX investigator to conduct a

comprehensive fact-finding.  Each party (complainant and respondent) at this stage, and throughout the process, is entitled to an advisor of their choice, including University-trained procedural advisors. *See generally id.* at pp. 24-25.  The Syracuse Procedures provide that "[p]rocedural advisors, including attorneys where applicable, have no standing in the University investigation or in the University Student Conduct System proceedings, except to provide advice to their respective parties in a quiet non-disruptive manner.  Advisors and attorneys when applicable, do not represent or speak for their respective parties.  Any advisor, including attorneys, who fails to conform their behavior to these requirements will be removed from the proceedings and barred from acting as an advisor in future University Student Conduct System proceedings." *Id.* at p. 24.

The fact-finding process led by the Title IX Investigator can include interviews with witnesses, as well as the parties.  Upon completion of the interviews and information-gathering, the Investigator prepares a report summarizing relevant factual findings. Dkt. # 1-1 at p. 25.  Both the complaining and responding parties are then given an opportunity to reply to the report, and those replies are shared by the Investigator with the parties (*i.e.*, the complainant is given respondent's reply, and respondent is provided with complainant's reply). *Id.*  Upon receipt of this input from the parties, the Investigator submits a final report ("Investigative Report"), together with the written replies (if any) from the parties and a statement of the underlying charges to a  three-member University Conduct Board, comprised of trained faculty and staff members. *Id.* at pp. 25-26.  The Investigative Report describes all relevant facts learned during the investigation, and summarizes the interviews conducted by the Investigator, but it does not include any conclusions regarding

responsibility for the charged violations, as that remains the province of the Board. *Id.*

After the initial investigation is complete, the parties and their advisors attend individual pre-hearing meetings to review the hearing process. *See generally* Dkt # 1-1 at pp. 25-26.  The Syracuse Procedures provide that the University Conduct Board may, in its discretion, choose to rely solely on the Investigative Report and any written replies from the parties for its understanding of the facts, it may conduct its own interviews and/or it may gather such additional information as it deems appropriate. *Id.*  Irrespective of the choice made in that regard, the Board invites both complainant and respondent to address it and to provide any additional information they deem pertinent. The Procedures also afford the parties an opportunity to access the records of any interviews conducted. *Id.*

At the conclusion of that portion of the process, the Conduct Board determines whether it is more likely than not that the responding party violated the Code of Student Conduct, using a preponderance of evidence standard.  After the hearing process closes, if responsibility is found by the University Conduct Board it may impose a sanction, up to and including expulsion from the University. Dkt. #1-1, at pp. 26-30.

The Syracuse Procedures allow either party to appeal the Conduct Board's decision on one or more of the following grounds: (i) new information that was not available at the time of the original hearing has been identified; (ii) a procedural error exists, which detrimentally impacted the outcome of the hearing; (iii) errors in the interpretation of University policy exist and are so substantial as to deny either party a fair hearing; and/or (iv) a grossly inappropriate sanction having no reasonable relationship to the charges was assessed. Dkt. # 1-1, at p. 35.  If an appeal is submitted by one party, the other party is

afforded an opportunity to submit a written response. *Id.*

The Syracuse Procedures afford the three-member Appeals Board wide latitude with respect to its review.  The Appeals Board can re-hear the case, or limit its review to the issues raised in the appeal filings. The Appeals Board issues a decision promptly after receipt of all submissions related to the appeal, unless it determines additional proceedings are warranted.  Thereafter, the Appeals Board decision is reviewed by the Senior Vice President and Dean of the Students, and again that review is broad in scope. The reviewing official considering the Appeals Board determination "may interview any participant in an earlier proceeding, change the decision, alter the sanction up or down, or return the case to the University Appeals Board or another hearing board for further process." *See* Dkt. # 1-1 at p. 36; *see generally id.* at pp. 35-36.

**C. The Fall 2016 Incident and Disciplinary Action Against John Doe**

John Doe was expelled from Syracuse for events that allegedly occurred in the early morning of September 14, 2016 ("the Incident"). Compl. ¶ 34.   On this day, John Doe engaged in sexual activity with another Syracuse student, Jane Roe. *Id.* ¶ 34(a).  John Doe denies any misconduct during the Incident. *Id.* ¶¶ 34-37.

Prior to the Incident, John Doe and Jane Roe had engaged in consensual sexual conduct on a number of occasions. *Id.* ¶ 35.  On the evening of the Incident, John Doe and Jane Roe exchanged a series of text messages with the goal of meeting at a fraternity party. *Id.* ¶ 36. They met and started kissing at the party. *Id.* They left the party and went to John Doe's room. *Id.*  One witness observed John Doe and Jane Roe coming back to John Doe's room.  This witness told investigators that "neither seemed like they were too drunk to

11

make a decision." *Id.* ¶ 36(a).  Another witness said that they were "both . . . intoxicated but not to the degree of being unable to stand or speak; they weren't stumbling." *Id.*  John Doe and Jane Roe engaged in sexual intercourse in John Doe's room. *Id.* ¶ 36(b).  The sex was "rough" but consensual. *Id.*  John Doe described Jane Roe as "aggressive" and "pulling me in hard." *Id.* The two fell asleep but woke between four and five in the morning, when they engaged in consensual sex for a second time. *Id.*  Jane Roe told investigators that she did not remember much of the sexual encounter in the room. *Id.* ¶ 36(c).  She said that John Doe bit her lip when they were making out. *Id.*  She also said that at one point she called him by a different man's name. *Id.*  She said that made John Doe "mad" but that his reaction was to "pull[] away" and say: "Really, are you serious? That's so not cool." *Id.* John Doe woke about 7 AM.  *Id.* ¶ 36(d).  John Doe claims that he said that he had an 8:00 class and needed to take a shower. *Id.*  Jane Roe claims that John Doe became upset because he (in her view) believed that she had urinated in the bed. *Id.*  Jane Roe claims that John Doe yelled at her. *Id.*  John Doe denied these allegations; but John Doe told a witness, "I don't know what happened but my bed is soaked." *Id.*

Jane Roe told the Investigator that she did not remember much of what happened in John Doe's room. *Id.* ¶ 37.  She said that she awoke with a swollen lip and bruises on her chest. *Id.*  Approximately 34 hours after the Incident, she saw a medical provider who observed bruises on her chest. *Id.*  However, Jane Roe also posted some Instagram photographs that did not show any bruising. *Id.*

On October 12, 2016, John Doe was notified by the Assistant Dean/Director of the Office of Student Rights and Responsibilities that Jane Roe had submitted a complaint of

misconduct.  Prior to any investigation, the Office of Student Rights and Responsibilities

instructed John Doe to not have any contact with Jane Roe. *Id*. ¶ 40.  Plaintiff contends:

> Jane Roe attempted to use the No Contact Order to punish John Doe by restricting him from his usual day-to-day activities. For example, in November 2016, Jane Roe alleged that John Doe violated this Order by eating in the same dining hall. There was no communication, only "eye contact." Jane Roe told the Office of Student Rights and Responsibilities that she felt "uncomfortable" and was upset that she had to leave while [John Doe] got to sit and enjoy a meal with his friends." An employee of the Office of Student Rights and Responsibilities observed that this did not "necessarily appear to be [an] intentional violation," but John Doe was still subsequently prohibited from entering the dining center.

*Id.* ¶ 40 (b).

The Investigative Report was completed on December 6, 2016. *Id.* ¶ 38.  Plaintiff

alleges:

> a.  The report attempted to estimate the blood-alcohol level ("BAC") of the complainant based on the amount of alcohol alleged[ly] consumed over a certain period of time. The investigators do not have any training in forensic medicine but, instead, relied upon a web page called the "Drink Wheel." (www.intox.com/drinkwheel.)

> b. Significant evidence in the report supported the statements of John Doe:

>> i. The report acknowledges that the "Complainant's description of events in Respondent's room is 'splotchy.'"

>> ii. The report indicates that witnesses described Jane Roe as "drunk but able to walk in a straight line and talk without slurring her speech."

>> iii. The report indicates that even Jane Roe did not believe that John Doe had committed sexual misconduct:

>>> Complainant initially reported the encounter as intimate partner violence and not sexual assault . . . Complainant's characterization of the encounter notwithstanding, the actions she described during both interviews with [the] Investigator objectively rendered uncertain whether she gave effective, affirmative consent to engage in sexual intercourse.

>> iv. Jane Roe alleged that John Doe had physically assaulted another student

13

during a sexual encounter.  However, this student told the investigators that the alleged physical assault was merely a "hickey" and that she had never been physically or sexually assaulted by John Doe.

c. The report included excerpts from text messages sent/received by Jane Roe. The report also included statements from witnesses who provided a significant amount of hearsay information.

d. The report contains a "credibility assessment."

   i. The report suggests that Jane Roe "presented as genuine and sincere" and that she was "visibly, appropriately, upset trying to recall the events." The report found that "no motive or bias was detected." The report suggests that Jane Roe's "description of events is largely corroborated by the available evidence.

   ii. The report suggests that John Doe's "description of events was plausible and largely consistent with the available evidence." The report discounted his testimony because he has "a natural bias, as a named respondent, to present information in a light most favorable to himself." However, the report concluded that "he is assessed as credible."

*Id.* ¶ 39(a-d).

The University Conduct Board held a hearing on January 20, 2017.  *Id.* ¶ 41.  At the hearing John Doe was permitted to tell his side of the story, but he did not have an opportunity to confront adverse witnesses, including Jane Roe.  *Id.*

On January 26, 2017, John Doe was informed that the University Conduct Board had found him responsible for a violation of the Syracuse Code of Conduct, and recommended that he be expelled from the University.  *Id.* ¶ 42.  The Board made a specific finding of fact that "both parties were intoxicated to the point where their judgment would be impacted," and found that John Doe "engaged in sexual intercourse with [Jane Roe] twice during the course of the" Incident.  *Id.* ¶ 42(b)(i-ii).  Although the Board found that both John Doe and Jane Roe were too intoxicated to provide consent, the Board only recommended that John

Doe receive discipline. *Id*. ¶ 42 (c).   On February 14, 2017 Syracuse denied John Doe's appeal and John Doe was expelled. *Id.*  ¶¶ 44-45.  This litigation followed.

## IV.   DISCUSSION

Syracuse moves to dismiss each claim asserted in the Complaint.  The Court addresses each in turn.

### a.  Title IX

Plaintiff's first a cause of action alleges gender-based discrimination in violation of Title IX of the Education Amendments Act of 1972.  Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Columbia Univ.*, 831 F.3d at 53.  "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." *Yusuf*, 35 F.3d at 715.  In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.*  In the second, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the

decision to initiate the proceeding was affected by the student's gender." *Id.*  Plaintiff argues that he proceeds under both theories.  Under either theory, Plaintiff must plead and prove that "the complained-of conduct was discriminatory." *Yusuf*, 35 F.3d at 715.  Thus, in order to establish a claim of discrimination under Title IX, Plaintiff must ultimately show that the defendant discriminated against him because of sex; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016)(internal quotation marks and citation omitted).

### 1.  Erroneous Outcome Claim

A plaintiff who brings an erroneous outcome Title IX claim "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf*, 35 F.3d at 715.  "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id.*  This is because Congress did not intend "Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement." *Id.*

> However, the pleading burden in this regard is not heavy.  For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof.  However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias.  A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous

> finding.  Allegations of a causal connection in the case of university
> disciplinary cases can be of the kind that are found in the familiar setting of
> Title VII cases.  Such allegations might include, *inter alia*, statements by
> members of the disciplinary tribunal, statements by pertinent university
> officials, or patterns of decision-making that also tend to show the influence of
> gender.  Of course, some allegations, such as statements reflecting bias by
> members of the tribunal, may suffice both to cast doubt on the accuracy of the
> disciplinary adjudication and to relate the error to gender bias.

*Id.* (citations omitted); *see Columbia Univ.*, 831 F.3d at 55–56 ("[A] complaint under Title IX,

alleging that the plaintiff was subjected to discrimination on account of sex in the imposition

of university discipline, is sufficient with respect to the element of discriminatory intent, like a

complaint under Title VII, if it pleads specific facts that support a minimal plausible inference

of such discrimination.").  "[T]he inference of discriminatory intent supported by the pleaded

facts [need not] be the most plausible explanation of the defendant's conduct.  It is sufficient

[at the Rule 12(b)(6) stage] if the inference of discriminatory intent is plausible." *Columbia*

*Univ.*, 831 F.3d at 57.

Plaintiff asserts that at the beginning of the disciplinary process, Syracuse "assumed

that John Doe was guilty because he was a male accused of sexual assault rather than

evaluating the case on its own merits." Compl. ¶ 50.  He further alleges that due to the

"substantial criticism of Syracuse, both in the student body and in the public media

(including the Internet), accusing schools of not taking seriously complaints of female

students alleging sexual assault by male students," *id.* ¶ 51(a), which "Syracuse's

administration was cognizant of, and sensitive to," *id.*, "Syracuse committed impermissible

gender bias against John Doe in the investigation and adjudication of Jane Roe's

accusations." *Id.* ¶ 51.  He asserts that, generaly, Syracuse fails to conduct a full and fair

investigation, fails to afford the accused counsel or the opportunity to present evidence in

their defense, fails to allow cross-examination of their accusers, fails to imbue the accused with the presumption of innocence, and fails to provide an impartial decision-maker.  *Id.* ¶ 54 (d-e).  This occurs, he contends, because there existed "[a] general atmosphere at Syracuse where those who lodge a complaint of sexual assault are immediately treated as 'survivors.'" *Id.*, ¶ 54(a). Plaintiff contends that "[t]his general atmosphere is a direct result of pressure on Syracuse from OCR, DOJ, student groups, and public opinion." *Id.*  ¶ 54(a). Plaintiff also alleges that "[t]he adjudication of the claims against John Doe occurred at the exact time that OCR officials were visiting Syracuse." *Id.* ¶ 54(b).

The particular circumstances that Plaintiff contends supports his erroneous outcome claim are: (1) the "Sexual Misconduct Policy ambiguously prohibits students from engaging in sexual intercourse with any other person that has consumed any amount of alcohol," and in this instance, Syracuse "applied this prohibition in a gender discriminatory manner." *Id.* ¶ 55; (2) the Hearing Panel concluded that both John Doe and Jane Roe were too intoxicated to meaningfully consent to sexual activity, but even though both students engaged in sexual activity, only John Doe was subject to discipline.  *Id.* ¶ 55(a);  (3)  "Syracuse assumed that Jane Roe, as an alleged female victim, was truthful.  As a result of this gender bias, Syracuse failed to adequately investigate and question Jane Roe's credibility, limited questions to and commentary of investigatory findings to Jane Roe's emotional state and interactions with friends and family in the days and weeks after the alleged incident, and failed to examine many of the blatant contradictions in Jane Roe's statements." *Id.* ¶ 55(b); and (4) "Although both John Doe and Jane Roe had been drinking, Syracuse identified John Doe as the initiator of sexual activity, notwithstanding the comparable intoxication of both

18

participants." *Id.* ¶ 55(c)(ii).

Plaintiff argues that the *Columbia University* decision is "precisely akin" to his case, and argues that "as binding precedent, [it] compels this Court to deny the Motion to Dismiss." Pl. Mem, L. p. 11. He argues further that the Complaint "mirrors" the allegations in *Columbia University* "in alleging that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Syracuse was motivated to accept the female's accusation of sexual assault and reject the male's claim of consent, to appear to the student body and the public as though Syracuse was serious about protecting female students from sexual assault by male students." *Id.* (citing Compl. ¶¶ 50-51).

In *Columbia University*, the Second Circuit vacated a district court's dismissal of a complaint that alleged that Columbia University had violated Title IX by acting with gender bias in investigating and suspending a male student for an alleged sexual assault. *Columbia Univ.*, 831 F.3d at 48. In reaching this conclusion, the Second Circuit found that the complaint in that action pleaded "sufficient specific facts giving at least the necessary minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6) motion to dismiss...." *Id.* at 56. The allegations that supported that inference in *Columbia Univiversity* included:

> (1) the investigator and hearing panel did not seek out all witnesses that the plaintiff had identified as sources of information favorable to him; (2) the investigator and panel failed to comply with Columbia University's procedures designed to protect accused students; (3) the investigator, the panel, and the reviewing Dean reached conclusions that were erroneous and contrary to the weight of the evidence; (4) during the period before the disciplinary hearing, both the student body and public media heavily criticized Columbia University and accused it of not taking seriously complaints of female students alleging

19

sexual assault by male students; and (5) Columbia University was aware of
and sensitive to those criticisms.

*Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 401 (W.D.N.Y. 2017)(citing

*Columbia Univ.*, 831 F.3d at 56–57).

Plaintiff's allegations that Syracuse assumed that he was guilty because he was a

male accused of sexual assault, and that Syracuse assumed that Roe was truthful because

of her gender, border on being "mere conclusory statements ... not entitled to the

assumption of truth."  *Iqbal*, 556 U.S. at 678.  Nonetheless, his allegations that the

Investigator noted that Roe's description of events in Doe's room was "splotchy;" that

witnesses describe Roe as "drunk but able to walk in a straight line and talk without slurring

her speech;" that Roe appeared to utilize the disciplinary process as a means to punish Doe

by alleging that he violated the No Contact Order when he entered the dining hall and by

alleging that Doe "physically assaulted" another female student during a sexual encounter

because Doe gave this student a hickey; that the investigation revealed that both Doe and

Roe were highly intoxicated but applied the presumption of the inability to knowingly

consent to sexual intercourse only to Roe; that Syracuse failed to adequately investigate

and question Roe's credibility; that Syracuse limited questions and commentary of

investigatory findings to Roe's emotional state and interactions with friends and family in the

days and weeks after the alleged incident; that Syracuse "failed to examine many of the

blatant contradictions in Jane Roe's statements;" and that the Investigator, the University

Conduct Board, the Appeals Board, and the Syracuse official who ultimately reviewed the

appeal chose to believe Roe's description of events in Doe's room even though Roe

indicated that she had very little memory of the Incident, provide sufficient fact-based

20

allegations to meet Plaintiff's minimal burden of casting some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.  While these issues standing alone "may not necessarily support an inference of bias on account of gender," *Rolph*, 271 F. Supp. 3d at 402, Doe, like the plaintiffs in *Columbia University* and *Rolph*, has coupled his factual allegations with the allegations of public pressure on the University to more aggressively prosecute sexual abuse allegations.  Like in these other cases, Doe's disciplinary proceeding occurred in the context of public criticism of the University's handling of sexual abuse complaints against males.  A reasonable inference could be drawn that the Investigator, the University Conduct Board, the Appeals Board, and the University official who ultimately decided the appeal were "motivated to refute [public] criticisms [of Syracuse's handling of sexual abuse allegations] by siding with the accusing female and against the accused male." *Columbia Univ.*, 831 F.3d at  58.  Moreover, Plaintiff's disciplinary proceeding occurred contemporaneously with a visit to Syracuse from OCR.  In light of OCR's Dear Colleague Letter and its two prior notifications to Syracuse that it was investigating whether the University was properly handling sexual abuse complaints, a reasonable inference could be drawn that the Investigator, the University Conduct Board, the Appeals Board, and the University official who ultimately decided the appeal were motivated to appease OCR by siding with Roe and imposing the maximum penalty of expulsion on Doe.  Plaintiff has presented allegations of facts supporting a minimal plausible inference of discriminatory intent. Thus, the motion on this ground is denied.

### 2.  Selective Enforcement Claim

Although not clearly set forth in the Complaint, Doe argues that he asserts a viable

Title IX selective enforcement claim.  He contends the claim is supported by his allegations that, although Roe filed a complaint alleging only intimate partner violence, Syracuse *sua sponte* interpreted the complaint as supporting a claim that Roe engaged in involuntary sexual intercourse with Doe because her level of intoxication made it impossible for her to give affirmative consent.  Doe points out that the University Conduct Board found that both Doe and Roe "were intoxicated to the point where their judgment would be impacted," and found that Roe's level of intoxication prevented her from providing affirmative consent, thereby justifying discipline upon Doe.  But, Doe argues, the Board made no similar recommendation to discipline Roe.  Doe contends that Roe's conduct is comparable to that for which he was disciplined, and Syracuse's failure to *sua sponte* initiate disciplinary proceedings against Roe evidences a gender bias by the University.  Doe further contends that public and OCR pressure on the University to more aggressively discipline male sexual assault respondents (as discussed above with regard to the erroneous outcome claim) supports a plausible inference of discriminatory intent by Syracuse.

Although the fact that Doe filed no complaint against Roe would ordinarily defeat a selective enforcement claim, *see Prasad,* 2016 WL 3212079, at *18,[3] here the University took the initiative  to transform Roe's complaint into a claim that she did not intend.  Because the University *sua sponte* took this action against Doe, but took no similar *sua sponte* action against Roe, a plausible selective enforcement claim is set forth. *See*

---

[3]("A Title IX 'selective enforcement' claim is based on the premise that 'regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'  The decision to initiate the proceeding here was made by [Roe], so [Doe] presents no viable selective enforcement claim against [Syracuse] on this basis.") (quoting *Yusuf*, 35 F.3d at 715)

*Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017).[4]   Whether Doe can

succeed on such a claim is not a question that this Court can or should answer at this

stage.  The motion on this ground is denied.

### b. Breach of Contract

Doe's second cause of action is for breach of contract.  Compl., ¶¶ 61-70.  He

contends that Syracuse breached its express and/or implied agreements with him, *id.*, and

that these "breaches" caused him damage.  *Id.* ¶ 70.

"'In New York, the relationship between a university and its students is contractual in

nature.'" *Xiaolu Peter Yu v. Vassar College*, 97 F. Supp. 3d 448, 481 (S.D.N.Y.

2015)(quoting *Papaspiridakos v. Educ. Affiliates, Inc.*, 2013 WL 4899136, at *3 (E.D.N.Y.

Sept. 11, 2013) *aff'd*, 580 Fed. Appx. 17 (2d Cir. 2014)).  "[A]n implied contract is formed

when a university accepts a student for enrollment: if the student complies with the terms

prescribed by the university and completes the required courses, the university must award

him a degree.  The terms of the implied contract are contained in the university's bulletins,

circulars and regulations made available to the student."  *Papelino v. Albany College of

Pharm. of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011)(internal quotation marks and citations

omitted).

"To survive a motion to dismiss for a breach of contract claim under New York law,

---

[4]("[The plaintiff, John Doe] alleges the College took proactive steps to encourage [a female student] to file a formal complaint against Doe when it learned he may have been subjected her to nonconsensual sexual activity.  But, when the College learned [the same female student] may have initiated sexual activity with Doe while he was 'blacked out,' and thus incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate.  Doe also alleges the severity of his punishment was due to his gender because the College intended his punishment to appease campus activists who sought the expulsion of a male student. These factual allegations are sufficient to survive a motion for judgment on the pleadings.").

the complaint must allege facts which show: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, 2015 WL 5023719, at \*5 (N.D.N.Y. Aug. 25, 2015)(citations and internal quotation marks committed).  "A student may sue his college or university for breach of an implied contract in certain situations," *Routh*, 981 F. Supp. 2d at 207, but "[t]he application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 359 (N.D.N.Y. 2014),  *recon. denied*, 2015 WL 1040172 (N.D.N.Y. Mar. 10, 2015).  "'[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.'"  *Habitzreuther*, 2015 WL 5023719, at \*4 (quoting *Radin v. Albert Einstein Coll. of Medicine of Yeshiva Univ.*, 2005 WL 1214281, at \*10 (S.D.N.Y. May 20, 2005)).  Thus, while "[a] college is 'contractually bound to provide students with the procedural safeguards that it has promised,'"  *Xiaolu Peter Yu*, 97 F. Supp. 3d at  481 (quoting *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 243 (D. Vt.1994)), a plaintiff must identify a specific promise or obligation that was breached in order to pursue a contract claim. *See Okoh v. Sullivan*, 2011 U.S. Dist. LEXIS 18524, at \* 14-15 (S.D.N.Y. Feb. 24, 2011) ("the mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted").  "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." *Habitzreuther*, 2015 WL 5023719, at \*5 (N.D.N.Y. Aug. 25, 2015); *see Ward v. N.Y. Univ.*, 2000 WL 1448641, at \*5 (S.D.N.Y. Sept.28, 2000)("[B]ald assertions and

24

conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim."); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998)("mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted").

In his opposition papers, Doe indicates that the alleged breaches are that: (1) he purportedly was not given sufficient notice of the complaint against him, dkt. # 19 at pp. 18-19; (2) the University allegedly failed to conduct a "full and fair investigation," *id.* at pp. 19-20, and (3) there was a purported "lack of fundamental fairness." *Id.* at pp. 20-21.  All these alleged breaches, however, are the types of general statements of policy which New York law dictates cannot form the basis of a viable contract claim. *See Gally*, 22 F. Supp. 2d at 207; *see also Nungesser v. Columbia Univ.*, 244 F. Supp. 2d 345, 373 (S.D.N.Y. 2017).[5] While Doe claims he was not provided "adequate notice" of the complaint against him, he does not identify a specific policy violation in this regard.  The provision that students receive "written notice" or "adequate notice" of complaints is incorporated in the "Fundamental Fairness" section of the Statement of Student Rights and Responsibilities, and in the Bill of Rights found in the Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence.  Dkt. # 1-1 at pp. 4 and 8, respectively. Provisions that students will be treated in a "fundamentally fair" manner, or in a manner that is consistent with fundamental "student rights," are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of

---

[5]("Nungesser alleges that Columbia breached six policies in its treatment of him [including its "policy concerning fair process to both complainants and respondents in disciplinary investigations and proceedings"]. He also alleges that Columbia violated the duty of good faith and fair dealing. None of these claims withstand scrutiny, however, because Nungesser has not identified the specific promises that Columbia has breached.")

contract claim. *See e.g. Ward*, 2000 WL 1448641, at *4.[6]  Moreover, Doe's breach of

contract claim with respect to "notice" fails because there is no allegation that notice was

not provided.  Allegations challenging the adequacy of the notice do not establish a viable

breach of contract  claim. *See Routh*, 981 F. Supp. 2d at 208-210.[7]  His remaining two

breach of contract claims, focused on alleged guarantees of "fairness," are equally

unavailing. *See Nungesser*, 244 F. Supp. 2d at 373.   Accordingly, the breach of contract

claim is dismissed.

### c. Negligence

In Plaintiff's third cause of action, he alleges that Syracuse was negligent because its

officials' actions "fell below the applicable standard of care for conducting investigations

into, and adjudicating allegations of, sexual misconduct and amounted to breaches of the

duty of due care."  Compl. ¶ 75.  In opposition to Syracuse's argument that the negligence

claim should be dismissed because it is duplicative of the breach of contract claims, *see*

*Prasad*, 2016 WL 3212079, at *23 ("[C]ourts routinely dismiss tort claims where they are

duplicative of a simultaneously pled breach of contract claim."), Doe contends that the

Complaint alleges that the obligation of Syracuse to conduct an investigation and

adjudicatory process in a non-negligent manner is derived from its  accreditation by the

Middle States Commission on Higher Education, not from the Student Conduct System

---

[6] ("Here, virtually all of the promised services that Ward cites, are broad pronouncements of the University's compliance with existing anti-discrimination laws, promising equitable treatment of all students. As such, they cannot form the basis for a breach of contract claim.")

[7] (Rejecting a breach of contract claim where plaintiff admitted receiving notice of the complaint but contended that such notice was insufficient.  The Court noted that plaintiff "has not indicated a particular policy or provision requiring the [University] to provide him with any level of detail or explanation in its decision, nor does the Court find any in the Standards of Student Conduct.")

Handbook (the source of the breach of contract claim).  However, Plaintiff fails to allege a legally plausible negligence claim.

As the Court stated in *Prasad*, "a claim of this nature 'fails as a matter of law because '[t]here is no cause of action in the State of New York sounding in negligent prosecution or investigation.'" *Prasad*, 2016 WL 3212079, at *23 (quoting *Xiaolu Peter Yu*, 97 F. Supp. 3d at 484 (in turn quoting *Coleman v. Corp. Loss Prevention Assocs.*, 282 A.D.2d 703, 724 N.Y.S.2d 321, 322 (2d Dep't 2001) and citing *Weitz v. State*, 182 Misc.2d 320, 696 N.Y.S.2d 656 (N.Y. Ct. Cl.1999) (applying this rule to "administrative disciplinary charges brought against a college or university student")).  Moreover,  District Judge Wolford of the Western District of New York rejected an argument identical that made by Doe, writing:

> Plaintiff's opposition papers focus on accreditation standards—as opposed to a contract—as the source of HWS's alleged duty. (Dkt. 17 at 25–26). In support of his position, Plaintiff argues that courts have recognized that accreditation standards create an independent duty of care for schools and other entities, citing a number of out-of-state cases. (Dkt. 17 at 26–27 (citing *United States ex rel. Diop v. Wayne Cty. Cmty. Coll. Dist.*, 242 F.Supp.2d 497, 524–25 (E.D. Mich. 2003); *Gess v. United States*, 952 F. Supp. 1529, 1552 (M.D. Ala. 1996); *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 222, 784 N.W.2d 907 (2010); *Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833, 837 (Alaska 2003)).  However, none of these cases support Plaintiff's position; in other words, none stand for the proposition that, under New York law, accreditation standards give rise to a duty of care for colleges or universities. Indeed, Plaintiff concedes that "New York does not appear to have addressed the issue." (Dkt. 17 at 26). Having failed to demonstrate that New York law recognizes a duty of care arising out of accreditation standards, Plaintiff's negligence claim is dismissed.

*Rolph*, 271 F. Supp. 3d at  409.

Because New York law does not recognize a claim for negligent prosecution or investigation, or a duty of care arising out of accreditation standards, Plaintiff's third cause of action is dismissed.

**V.     CONCLUSION**

For the reasons discussed above, Syracuse's motion to dismiss Plaintiff's Complaint for failure to state viable claims, (Dkt. # 15), is **GRANTED in part** and **DENIED in part**. Specifically, Syracuse's motion is denied with respect to Plaintiff's Title IX claims (Count I), and granted with respect to Plaintiff's state law claims (Counts II and III) which are **DISMISSED**.

**IT IS SO ORDERED.**

Dated:   September 16, 2018

Thomas J. McAvoy
Senior, U.S. District Judge