**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>SYRACUSE UNIVERSITY,<br><br>Defendant. | CIVIL NO.  5:17-CV-0787 (GTS/ATB)<br><br><br><br>MOTION FOR PARTIAL SUMMARY JUDGMENT |

Plaintiff John Doe, respectfully submits this Motion for Partial Summary Judgment. Plaintiff requests that the Court enter partial summary judgment against Defendant Syracuse University ("Syracuse") on the issue of liability on Plaintiff's Selective Enforcement claim and set this matter for a trial to determine damages and any appropriate permanent injunctive relief.

A Statement of Material Facts accompanies this Motion.

**MEMORANDUM OF LAW**

**A.      Standard**

Summary judgment is warranted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).

**B.      Context**

This case is one of many amidst a growing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses.  After years of criticism for being too lax on campus sexual assault, on April 11, 2011, the U.S. Education Department's Office of Civil Rights

1

("OCR") sent a "Dear Colleague Letter" to colleges and universities. Letter from Office for Civil Rights, U.S. Dep't of Educ. (April 11, 2011). (*See* Amended Complaint ¶¶9-12, JA95-96.) The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. The procedures adopted by schools have received substantial criticism from federal courts in recent years. For example, one federal court observed:

> Sexual assault is a deplorable act of violence… Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D. Ohio 2018).

On September 22, 2017, OCR withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). In withdrawing the Dear Colleague Letter, OCR observed that prior actions

> may have been well-intentioned, but… led to the deprivation of rights for many students — both accused students denied fair process and victims denied an adequate resolution of their complaints.

*Id.* at 1-2. OCR further acknowledged:

> Legal commentators have criticized the [Dear Colleague Letter]… for placing 'improper pressure upon universities to adopt procedures that do not afford fundamental fairness.' [As a result, many schools have established procedures for resolving allegations that] lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.

*Id.*, *quoting* Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; Members of the Harvard Law School Faculty, *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

This context is important because, while federal courts have traditionally deferred to school officials in disciplinary situations, this deference has not been extended to the Title IX context.  In a recent decision, the Second Circuit warned that when schools, like Syracuse, "distort and deviate from [Title IX] policies, fearfully deferring to invidious stereotypes and crediting malicious accusations, they may violate the law." *Menaker v. Hofstra Univ.*, 2d Cir. No. 18-3089-cv, 2019 U.S. App. LEXIS 24283, at *2 (Aug. 15, 2019).   In several recent lawsuits against private schools challenging Title IX procedures, courts have, on summary judgment records, expressed concern about the discriminatory actions of schools and/or the failure of schools to comply with their own procedures. *Doe v. Quinnipiac Univ.*, D.Conn. No. 3:17-cv-364, 2019 U.S. Dist. LEXIS 115089, at *35-39 (July 10, 2019 (the plaintiff had put forth sufficient evidence of procedural irregularities and disparate impact to show that the school acted in discriminatory manner); *Doe v, Grinnell College,* S.D. Iowa No. 4:17-cv-00079 at *22-23 (July 9, 2019 Entry, Doc#151) (Exhibit U) (a reasonable jury could deduce the determinations of responsibility for the accused student was "based on a biased perspective regarding the behavior of women during sexual encounters").[1]

---

[1] Numerous other lawsuits against private schools challenging Title IX procedures have survived preliminary motions as federal courts expressed concern about the discriminatory actions of schools and/or the failure of schools to comply with their own procedures.  *See e.g. Rolph v. Hobart & William Smith Colls.,* W.D.N.Y. No. 6:16-CV-06515 EAW, 2017 U.S. Dist. LEXIS 153838, *34 (Sep. 20, 2017) (denying motion to dismiss Title IX claim because "plaintiff has adequately alleged facts that plausibly support at least a minimal inference of gender bias on the part of" school); *Brown Univ., supra* (denying motion to dismiss breach of contract claim based on alleged "pressure [from OCR] on universities"); *Doe v. Amherst College*, 238 F.Supp.3d 195, 216 (D.Mass. 2017) (denying motion for judgment on pleadings for breach of contract for school policies enacted due to OCR pressure); *Naumov v. McDaniel College, Inc.*, D.Md. No. GJH-15-482, 2017 U.S. Dist. LEXIS 49887, at *29 (Mar. 31, 2017) (rejecting argument that Dear Colleague Letter required breach of college handbook); *Collick v. William Paterson Univ.*, D.N.J. No. 16-471, 2016 U.S. Dist. LEXIS 160359, at *69-70 (Nov. 17, 2016)("the Complaint sufficiently alleges that Defendants did not adhere to [the school's] own rules, that the procedure they followed was unfair, and that the decision was not based on sufficient evidence"); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 600 (D.Mass.2016)("the Court concludes that the complaint plausibly alleges that [the school] did not provide 'basic fairness' to" accused student); *Doe v. Lynn Univ., Inc.*, S.D.Fla. No. 9:16-CV-80850, 2017 U.S. Dist. LEXIS 7529, at *17 (Jan. 19, 2017) (plaintiff stated valid claims for of contract and breach of the implied covenant of good faith and fear dealing in connection with sexual assault investigation).

**C.     Plaintiff's Title IX Selective Enforcement Claim**

**1.     Elements Of The Claim**

Title IX prohibits certain forms of sex-based discrimination in the educational context. 20 U.S.C. § 1681(a).  *See e.g. Murray v. New York University College of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995) (Title IX prohibits gender discrimination against students enrolled in federally supported educational programs); *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities."). .

As this Court observed in denying Defendant's Motion to Dismiss, under Title IX, students "attacking a university disciplinary proceeding on grounds of gender bias" may assert two types of claims — "Erroneous Outcome" and "Selective Enforcement." *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 135 (N.D.N.Y.2018), *citing Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  Under the Second Circuit's *Yusuf* decision, to state a Selective Enforcement claim, a student must allege, that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender. 35 F.3d at 715.  In a Selective Enforcement claim, a plaintiff alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's gender. *Yusuf*, 35 F.3d at 715. Thus, to prevail on a Title IX Selective Enforcement claim, Plaintiff must demonstrate that a similarly-situated member of the opposite sex was treated more favorably. *Doe v. Rollins College*, 352 F. Supp. 3d 1205, 1211 (M.D.Fla. 2019*), citing Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003).  In other words, a plaintiff succeeds if he can demonstrate that a person of the opposite sex was in circumstances sufficiently similar to plaintiff's and was treated more favorably by a defendant educational institution. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

4

### 2. Plaintiff Is Entitled To Summary Judgment On His Title IX Selective Enforcement Claim

Plaintiff is entitled to Partial Summary Judgment on his Selective Enforcement claim because "a female was in circumstances sufficiently similar to [plaintiff's] and was treated more favorably by the University." *Mallory v. Ohio Univ.*, 76 F.App'x 634, 641 (6th Cir.2003).

### a. Jane Roe Is The Comparator

The female in circumstances sufficiently similar to Plaintiff's is Jane Roe.  According to the UCB, Jane Roe and John Doe engaged in the exact same conduct which, if true, violated the Sexual Misconduct Policy: sexual activity with a person who was too intoxicated to provide consent.  The Panel explicitly said that *both* John Doe and Jane Roe "were intoxicated to the point where their judgment would be impaired."  Yet, Syracuse only considered whether John Doe would face discipline.

Under the terms of the Syracuse Policy, John Doe would have been considered to be "incapacitated" because he was "substantially impaired" when he engaged in sexual activity with Jane Roe.  One administrator testified:

> Q Now, my understanding also is that, even if there is affirmative consent, if the person is incapacitated or substantially impaired, that consent is invalid?
> A Correct.
> Q So, if a person is intoxicated or substantially impaired, even if they say yes, that's not considered a valid yes?
> A If they're incapacitated, correct.[2]

An Appeal Panel member observed that the issue in the case was intoxication, and that there was evidence that both parties were intoxicated:

> Q Was it your understanding in reviewing this matter that the basis for this lack -- that the alleged lack of consent in this case was intoxication?...
> A I would say yes.
> Q In reviewing this case, did you find any information suggesting that the respondent was intoxicated?
> A Both parties had been drinking.[3]

---

[2] Deposition of Eric Nestor (Nestor Depo.) (Exhibit J) at 56-57.
[3] Deposition of Arnie Redmond  ("Redmond Depo.) (Exhibit K) at 46.

The administrator further explained that John Doe would have been unable to provide consent to sexual activity under the Syracuse policy under the UCB Findings of Fact:

> Q Now, I'll draw your attention to the Finding of Fact Number 2. It says that both parties were intoxicated up to the point where their judgment would be impaired. Did I read that correctly?
> A Yes, you did….
> Q So, if a person is intoxicated to the point where their judgment would be impaired, they would be unable to consent to sexual activity; right?
> A Yes.[4]

Later he testified the same way:

> Q …You provide the board advice on application of the Syracuse policy; right?
> A Correct.
> Q Okay. You are the most knowledgeable person in the room about the Syracuse policy; right?
> A Correct.
> Q So I'm asking you: In your training and experience, if a person is intoxicated to the point where their judgment would be impaired, are they able to consent to sexual activity under the Syracuse policy?
> A No.[5]

In other words, Jane Roe is a valid comparator because she is a member of the opposite sex who was treated more favorably by the educational institution. Even though both parties were intoxicated, Syracuse only considered whether John Doe had committed misconduct. This was admitted in a deposition of the chair of the Appeals Panel:

> Q Are you aware if Syracuse took any action as a result of receiving information that [John Doe] was too drunk to engage in sexual activity?
> A Not that I'm aware of.
> Q Did you take any actions?
> A No.
> Q You didn't report that to the Title IX office?
> A This case had already been -- this case was already part of a review process.
> Q Did you ever inquire of the Title IX office 'why aren't you investigating both parties for alleged misconduct'?
> A No.
> Q And, in fact, if you look at the opinion of the board, they say the exact same thing in Finding of Fact Number 2, right, that both parties were intoxicated?

---

[4] Nestor Depo. at 98-99.
[5] Nestor Depo. at 100-101.

A That is what it says, yes.
Q When you read that, did you make any inquiries of the Title IX office as to why both parties were not subject to potential discipline?
A No.[6]

Syracuse was much more pro-active with Jane Roe than John Doe  Syracuse assigned an "advisor" to Jane Roe and conducted substantial follow-up interviews and meetings with her, but no Syracuse employee ever affirmatively inquired of John Doe to see if he wanted to pursue a case against Jane Roe.  This was particularly true after the investigator reviewed the text messages indicating that both students were too drunk to consent – the Investigator was aware of possible misconduct, yet never reported the matter to the Title IX Office so the officials could determine if John Doe wanted to pursue a complaint or receive any accommodations, or whether the Title IX Office wanted to pursue disciplinary proceedings against Jane Roe even in the absence of John Doe's cooperation.

Q … This allegation here in this text message is not very different from the original allegation that initiated this investigation; right?
A From this text message – …I'd say that's correct.
Q So did you report this to the Title IX coordinator to see if she wanted to open up a new investigation about whether the respondent was too drunk to engage in sexual activity?
A It was certainly discussed in this case while it was still being investigated. I had already spoken with respondent at that point to  understand better what -- or at least I had a better understanding of what he meant by way too drunk.
Q So the answer's no, you didn't take any other activity when you reviewed that text message?
A No. I included this as part of my report.
Q At any point was there a discussion about whether the complainant had violated the Syracuse sexual misconduct policy?
A I don't recall any discussion of that.[7]

In this respect – the school meeting multiple times with Jane Roe and only once with John Doe – this case is similar to a recent decision in *Doe v. Amherst College,* 238 F. Supp. 3d 195 (D.Mass. 2017). In *Amherst College*, the court found sufficient allegations to survive a motion for judgment on the pleadings on a selective enforcement claim where, as in this case, there was allegations that both

---

[6] Redmond Depo. at 48-49.

[7] Deposition of Bernerd Jacobsen ("Jacobsen Depo.") (Exhibit I) at 107-108 (objections omitted).

the male and female students in the case had engaged in sexual activity while intoxicated, yet only the

male student was subject to discipline.  In this case, the investigator testified that he met with Jane

Roe twice, but after receiving evidence from John Doe that suggested that he, too, may have been too

intoxicated to consent to sexual activity, he did not go back and question Jane Roe about her possible

misconduct.

> Q Now, during the course of your investigation, you conducted two interviews with the complainant; right?
> A Yes.
> Q Okay. And those both were before you interviewed the respondent?
> A That's correct.
> Q Did you go back and conduct any interviews with [Jane Roe] after you received information from [John Doe]?
> A No.[8]

Similarly, in *Amherst College* the court observed that there was disparate treatment in how allegations

against the male and female students were treated as the investigation turned up possible misconduct

by the female student:

> [Plaintiff] alleges the College took proactive steps to encourage [the female student] to file a formal complaint against [Plaintiff] when it learned he may have been subjected her to nonconsensual sexual activity. But, when the College learned [the female student] may have initiated sexual activity with [Plaintiff] while he was "blacked out," and thus incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate.

238 F. Supp. 3d at 223.[9]

The decision of Syracuse to not investigate Jane Roe is based on a stereotypical view of males

as sexual aggressors and females as passive – in this stereotypical view males are responsible for

---

[8] Jacobsen Depo. at 93.

[9] *Routh v. Univ. of Rochester*, 981 F.Supp.2d 184, 216 (W.D.N.Y.2013), is not to the contrary.  In that case, the court dismissed a  claim by male that he was prevented from filing cross-complaint against female because "There is no indication that [plaintiff] availed himself of that opportunity." In contrast, in this case Syracuse *sua sponte* considered the intoxication issue without such a complaint being lodged by either party.

obtaining consent from females, but not the other way around.[10]   In other words, males are viewed as the initiators of sexual activity and females as 'gatekeepers' to male sexual desire.  In this archaic view, men are perceived as always ready for sexual activity and therefore not the ones 'giving' their consent. In contrast, females are perceived as the ones setting boundaries on all sexual activity and therefore not the ones 'obtaining' consent from others.  The prevalence of this view is not theoretical, but is demonstrated by the pattern of enforcement of the Sexual Misconduct Policy at Syracuse.  A chart produced by Syracuse in Discovery shows that, for the years 2014-2015, every student accused of sexual assault was male.  In 2015-2016 there were three instances where the respondent was female, but in each of the instances where the respondent is female the complainant was also female. In other words, in no case was there a female accused of sexual misconduct against a male victim.[11]   A statistician reviewed these statistics and found that the observed preponderance of females lodging complaints against males is statistically significant – even when taking into account that females are substantially more likely to be the victims of sexual assault.[12]

---

[10]*See* Michael W. Wiederman, *The Gendered Nature of Sexual Scripts*, The Family Journal, 13(4): 496-502 (October 2005) ( "It is the female's role to limit sex, for both participants' own good, so the male is free to focus on outwitting her defenses to the extent necessary to achieve sexual activity. That females' standards typically represent a barrier each male must overcome fits well with the competitive and achievement-oriented aspects of masculine gender roles.")

Academic studies have found that on campuses, "consent promotion initiatives may, whether intentionally or not, perpetuate a sexual double standard and women's gatekeeper status."  Kristen N. Jozkowski, Tiffany L. Marcantonio, and Mary E. Hunt, *College Students' Consent Communication and Perceptions of Sexual Double Standards: A Qualitative Investigation,* Perspectives on Sexual and Reproductive Health, 2017, 49(4):237–244.  The authors further observed:

> The endorsement of "hegemonic gender roles rooted in the social dominance of men over women" is prevalent on U.S. college campuses.  Such norms reinforce traditional sexual scripts that depict men as sexual initiators and women as sexual gatekeepers. These scripted roles dictate that men initiate sexual activity, often via nonverbal cues, and women respond to men's advances.  (Citations omitted)

[11] List of Sexual Assault and Harassment (2013-2016) (Exhibit F).

[12] Joel Morse Report (Exhibit V).  Defendant will likely respond that the majority of accusers of sexual assault are female and the majority of the accused are male.  Prof. Morse took this into account.

When confronted with this apparent inequity, the Syracuse Appeal Officer (to his credit) tacitly acknowledged that Syracuse may never have considered that the school was acting consistent with the stereotype of males as responsible for initiating all sexual conduct.  He testified:

> Q Do you have concerns that that's not an equitable result?...
> A I'm not sure how I feel about that.
> Q What's causing you some hesitation?
> A I hadn't thought -- I have not thought about it that way. I'm not sure how I feel about that.
> Q Does it change your opinion if in every case where both parties are intoxicated only the male student is subject to discipline?
> A No, I don't think the male student only should be subject to discipline. I could see where there are cases where a female should be subject to discipline as well.
> Q Are you aware of any case in the past five years at Syracuse University where a female student was subject to discipline for engaging in sex with a male student?
> A Not that I can recall.[13]

Courts have observed that the use of stereotypes of male sexual conduct can lead to an inference of gender bias. *Cf. Oakstone v. Postmaster Gen.,* 332 F.Supp.2d 261, 271-272 (D.Me. 2004) (observing that assault charge against a male "would trigger an immediate and irreparable consequence for him due to a stereotype about his gender"); *Rachuna v. Best Fitness Corp.,* W.D. Pa. No. 1:13-cv-365, 2014 U.S. Dist. LEXIS 61674 (May 5, 2014) (allowing discrimination claim to proceed on gender-stereotyping theory where plaintiff alleged that defendant "had an expectation that, because [plaintiff] was male, he would fit the same 'male' gender stereotype of being sexually loose, promiscuous and predatory"); *Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.,* D.Mass. Civil Action No. 18-12485-NMG, 2019 U.S. Dist. LEXIS 134852, at *22 (Aug. 9, 2019) ("It is certainly plausible that [the school's] purported ideal of the 'modern' man or woman is informed by stereotypes about how men and women should act.").

John Doe's case was not an isolated occurrence.  After some student protests, the Chancellor promised changes to how the school dealt with sexual assault allegations.[14]  He said, "I've heard very

---

[13] Redmond Depo. at 49-50 (objections omitted) (emphasis supplied).

[14] USA Today College, *'Rally For Consent' protest aims to alter sexual assault resources at Syracuse*, September 19, 2014. An organization called "THE General Body," a collective of student organizations, spent close to three weeks

much that people wanted to be consulted about major decisions at the university before they're announced.  As Chancellor, I'm committed to that, and I've learned from this experience."[15]  In July 2015, New York state Gov. Andrew Cuomo signed into law the "Enough is Enough" legislation to combat sexual assault on college campuses.  The Syracuse Chancellor adopted the "Enough is Enough" legislation in summer 2015, making him the first private college chancellor or president to do so.  Syracuse, nonetheless, has been the subject of two OCR investigations.

Consistent with its stereotypical view of males, in another case Syracuse also failed to investigate allegations and information that female students engaged in sexual activity with male students who were intoxicated and, as a result, may have been unable to provide voluntary consent to sexual activity.  In that case, like in this case, Syracuse made specific findings of fact that both the male and female student were intoxicated.  Based on this finding of fact, Syracuse concluded that the female student was "incapable of *giving* consent" but that the male student was "incapable of *gaining* consent" (emphasis supplied).  Syracuse then explicitly found that the male student in that case — but not the female student – had committed sexual misconduct.[16]

---

occupying the Syracuse administration building. Among the demands from THE General Body were an increase in attention to the issue of sexual assault. Syracuse New Times, Nov. 24, 2014.

[15] WRVO, *SU students protest closure of sexual assault advocacy center,* Sept. 18, 2014.

[16] UCB Opinion (Exhibit W) at Page# SYR2859.  In that case, the male student indicated that the female student had initiated sexual activity when he was intoxicated.  The report includes his statement that "at no point did he give consent for the [female student] to have sex with him." The Findings of Fact in this case, which remarkably mirror almost verbatim the stereotype of males as the initiators of sexual activity and females as 'gatekeepers' to male sexual desire, are set forth here:

The decision of the Sixth Circuit in *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018), is on-point.[17]  *Miami Univ.* involved a situation where a male and a female student had consumed alcohol and then engaged in sexual conduct.[18]  The female student later claimed that some of the activity was



[17] Although considered under §1983 because Miami University is a public institution, the analysis of a selective enforcement claim under Title IX in this case is the same; the actionable "unequal treatment" arises out of a school administrator's "failure to initiate the University's disciplinary process with respect to" an alleged victim of the opposite gender "after receiving credible information that [the alleged victim] may have violated the sexual-misconduct policy."  882 F.3d at 597.  *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("Selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect."); *United States v. Barnett*, M.D.Fla. No. 2:08-cr-100, 2009 U.S. Dist. LEXIS 127287, at *35 (Jan. 14, 2009) (applying equal protection standards to claims alleging racially selective enforcement); *Thai Meditation Assn. of Alabama v. City of Mobile*, S.D.Ala. No. 1:16-cv-395-TFM-MU, 2019 U.S. Dist. LEXIS 87814, at *30 (May 23, 2019) (selective enforcement analysis for "nondiscrimination and equal protection claims is essentially the same").

[18] Significantly, the Sixth Circuit observed that "the exact alleged sexual misconduct of each student" need not be the same. 882 F3d at 597 ("we have not previously required a plaintiff to allege that the misconduct giving rise to an allegedly discriminatory disciplinary outcome be of the same type and degree"), *citing Heyne v. Metro. Nashville Pub. Schools*, 655 F.3d 556, 571 (6th Cir. 2011) (holding that the plaintiff sufficiently pleaded an equal-protection claim when he alleged that he was punished more harshly for running over another student's foot with his vehicle than the other student was for threatening the plaintiff's life because of the different races of the two students).

Other courts have relied on *Miami Univ.* to support Title IX selective enforcement claims.  *Doe v. Ohio State Univ.*, 323 F. Supp. 3d 962, 967 (S.D. Ohio 2018) ("the Sixth Circuit's decision in *Miami Univ.* suggests that the Court can consider Jane Doe a similarly-situated member of the opposite sex and that John Doe did not have to file a formal complaint against her to be similarly situated"); *Sheppard v. Visitors of Virginia State Univ.*, E.D.Va. Civil Action No. 3:18-CV-723, 2019 U.S. Dist. LEXIS 70661, at *11 (Apr. 25, 2019) (observing that "three federal courts of appeals have recognized the selective enforcement theory").

not consensual.  This accusation of sexual misconduct was evaluated by the school, and the male student was found responsible for violating the school's sexual-assault policy.  The court observed that during the investigation of whether the male student had committed misconduct, the investigators and administrators had received information that the male student was also intoxicated and, as a result, unable to provide consent to sexual activity.  The court found unequal treatment when approved of an equal protection claim in this circumstance:

> [The administrator] knew that [the female student] had potentially violated the University's sexual misconduct provisions at the same time she reviewed the allegations against [the male student]. … [The administrator] chose to pursue disciplinary action against [the male student], but not [the female student]...

882 F.3d at 596.[19]  Thus, as in *Miami Univ.*, Syracuse "had credible information that both students had potentially violated the University's sexual misconduct policy [but] . . . chose not to pursue disciplinary action against" one of the students. 882 F.3d at 596.

### b.    John Doe Was Not Required To Make A Complaint

Syracuse did not consider charges against Jane Roe because John Doe never made a complaint of misconduct.  A Syracuse administrator testified:

> Q So why… did you not initiate a disciplinary proceeding against [Jane Roe]?
> A Because this case involved a complaint that was made by the complainant against the respondent and the respondent would have had the opportunity to make that same allegation against the complainant at any point in time through the Title IX investigative process.[20]

---

*Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019), is not to the contrary.  In *Haidak*, unlike in this case, the student failed to allege that the university pursued a case against the male student, and not the female student, because of the influence of gender. 933 F.3d at 73-74.

[19] *Doe v. Case W. Res. Univ.*, N.D.Ohio No. 1:17 CV 414, 2019 U.S. Dist. LEXIS 74520 (May 1, 2019), and *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D.Tenn. 2018), are inapposite.  In *Case W.*, both students were intoxicated but the record failed to allege that "all of the alleged sexual acts were initiated and performed by" the male student.  2019 U.S. Dist. LEXIS 74520 at *39.  Similarly, in *Z.J.* both the male and female students "seem[ed] to agree that it was [the male student] who sought to initiate sexual intercourse."  355 F. Supp. 3d at 678.  In contrast, in this case, John Doe alleged that jane Roe initiated some sexual activity.

[20] Nestor Depo. at 101.

As a legal matter, Jane Roe can serve as a comparator even though John Doe did not submit a complaint against her.  A comparator need not be identical, but only be similarly situated to the plaintiff "in all material respects."  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011), *quoting Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008).  Under this standard, a plaintiff must only identify comparators whom a "prudent person" would deem to be "roughly equivalent," but there need not be "an exact correlation" between the plaintiff and the comparators. *Mosdos Chofetz Chaim,* 815 F. Supp. 2d at 696, *quoting Abel v. Morabito*, No. 04-cv-07284, 2009 U.S. Dist. LEXIS 9631, at *5 (S.D.N.Y. Feb. 10, 2009).  *See also T.S. Haulers. Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) (observing that "Exact correlation is neither likely nor necessary…").

As a factual matter, not requiring John Doe to make a complaint is consistent with the terms of  Syracuse policies; John Doe was not required to make a complaint to generate a response from Syracuse because Syracuse is a 'Mandatory Reporting' school.[21]  The Syracuse Appeal Officer testified that the obligations of Syracuse to act turn on the "awareness" by the school of possible sexual misconduct, not a specific complaint by a student.[22]  The Investigator provided similar testimony:

> Q So, if during the course of your investigation you uncover information that suggests that an additional act of sexual misconduct has occurred, are you required to report that?
> A Yes.[23]

A Title IX Administrator explained that even if a student does not make a specific report of misconduct, the provision of information describing sexual misconduct cannot be ignored by Syracuse personnel.

> A …if there is knowledge of sexual assault or other types of violent crimes that it needs to be reported…

---

[21] Nestor Depo. at 74.

[22] Redmond Depo. at 36-37.

[23] Jacobsen Depo. at 73.

14

Q So, if you received information that a potential sexual assault had occurred, what would you do?
A I would notify the Title IX office….
Q So just so I'm clear, if you receive any information that suggests sexual misconduct, you're supposed to report it?
A If I receive a report from a student that says they believe they were sexually assaulted.
Q What if -- is there a special term 'report from a student'? What does that mean?
A So, if I was having a conversation with a student and they indicated that they thought that's what occurred, I would inform the Title IX office.
Q What if you were having a conversation with a student and the student said – described what happened to them and, based on what happened to
them, it sounded like a sexual assault that occurred; what would you do?
A I would discuss with them the sexual assault process, policies, and provide them resources to reach out if they wanted to.
Q You would not just ignore it?
A I would not ignore it, correct.[24]

Accordingly, Syracuse in this case did exactly what the school was not permitted to do – Syracuse employees received information that John Doe was too intoxicated to consent to sexual activity, yet they ignored the information.

## CONCLUSION

This Court should enter partial summary judgment against Syracuse on the issue of liability on Plaintiff's Selective Enforcement claim and set this matter for a trial to determine damages and any appropriate permanent injunctive relief.

---

[24] Nestor Depo. at 75-77.

Respectfully submitted,

_____/s/ Joshua Engel_____
Catherine H. Josh, Esq. ((5025036)
45 Exchange Boulevard, Suite 915
Rochester, NY 14614
585-423-1974
585-325-6075 (fax)
chjesq@gmail.com

Joshua Adam Engel (Ohio No. 0075769)
(*pro hac vice*)
ENGEL AND MARTIN, LLC
5181 Natorp Blvd., Suite 210
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

This certifies that the foregoing was filed electronically on October 7, 2019.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

_____/s/ Joshua Engel_____
Joshua Adam Engel (Ohio No. 0075769)
(*pro hac vice*)