**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN DOE,**

                **Plaintiff,**

    **v.**                            **No. 5:17-cv-787**
                                            **(TJM/ATB)**

**SYRACUSE UNIVERSITY,**

                **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

Before the Court are Plaintiff John Doe's motion for partial summary judgment and Defendant Syracuse University's ("Syracuse" or "the University") motion for summary judgment. See dkt. #s 63, 78. Also before the Court is a motion by the *Daily Orange*, an independent student newspaper at Syracuse University, to lift the Court's order sealing a certain document in this case. See dkt. # 72. The parties have briefed the issues, and the Court has determined to decide the matter without oral argument.

**I.    Background**

This case concerns disciplinary action taken by Defendant Syracuse University against Plaintiff John Doe. After an investigation and a hearing, the University concluded that Doe violated the University's student contact policy by sexually assaulting another

1

student, Jane Roe,[1] on the night of September 13, 2016 and the early morning hours of September 14, 2016.  The University also found that Plaintiff had violated an interim no-contact order that administrators issued.  After Plaintiff's appeal failed, the University expelled him.  The instant action, in which Plaintiff alleges discrimination on the basis of his sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, et seq., followed.

> **A.    The Climate at Syracuse University Concerning Sexual Assault Allegations[2]**

Plaintiff alleges that in "the period preceding the disciplinary sanctions" he faced, "there was substantial criticism of" the University, "both in the student body and in the public media[.]" Plaintiff's Statement of Material Facts in Support of his Summary Judgment Motion ("Plaintiff's Statement"), dkt. # 63-2, at ¶ 1.  This criticism "accus[ed] Syracuse of not taking seriously complaints of female students alleging sexual assault."  Id.  Defendant disputes Plaintiff's allegation, noting that the "University in fact devotes substantial resources to anti-harassment, anti-violence[,] and anti-discrimination efforts, including efforts related to sexual misconduct and sexual assault."  Defendant's Response to Plaintiff's Statement of Material Facts in Support of his Summary Judgment Motion

---

[1]Both students have been identified only by pseudonyms throughout the litigation.

[2]Both parties filed motions for summary judgment.  Both parties also filed statements of material fact as required by Local Rule 7.1 in support of their motion, and replies to the opposing parties' statement.  As Plaintiff filed his motion first, the Court has drawn most of the facts from that statement.  The Court has cited to this statement for facts which are undisputed, and has cited to the Defendant's response in explaining disagreements on such facts.  The Court has supplemented its summary of the facts when necessary with additional facts advanced by the Defendant in the statement of facts Defendant supplied in support of the University's motion.

("Defendant's Response"), dkt. # 73-1, at ¶ 1.  Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education and Advocacy in December 2014.  Plaintiff's Statement at ¶ 1(a).  Plaintiff contends that the report focused on men when discussing how to prevent sexual violence, pointing to a statement that "[t]he discourse on campus about sexual assault and relationship violence typically focuses on male-on-female violence involving students who are full time undergraduates, White, and heterosexual."[3]  Id.

Plaintiff notes that the United States Department of Education's Office of Civil Rights (OCR) conducted two investigations into the University's response to the allegations of sexual assault.  Id. at ¶ 1(b).  OCR notified Syracuse on June 22, 2016 and January 17, 2017 that Office was investigating two complaints that the University had failed to respond "'promptly and equitably'" to a "'report of sexual assault.'"  Id.  The University acknowledges the existence of these notices, but also notes that the OCR's investigation did not result in a finding that the University had violated the law related to Title IX compliance and enforcement.  Defendant's Response at ¶ 1(b).  Status reports from the Chancellor's Task Force on Sexual and Relationship Violence noted that the Syracuse was monitoring developments related to the OCR investigation.  Plaintiff's Statement at ¶¶ 1(c)-1(d).

**B.     Data on Adjudications at Syracuse Involving Sexual Assault**

Plaintiff points to data provided by the University to show that Syracuse undertook 31 investigations of allegations of sexual assault between 2013 and 2016.  Id. at ¶ 2.  30 of

_____

[3]The Court notes that this statement could be read as critical of a campus climate that discusses (has a discourse about) sexual violence that fails to acknowledge that men, non-white people, part-time students, and people who are not heterosexual also experience sexual violence.

those investigations involved allegations that a male student had sexually assaulted a female student.  Id.  One case involved an allegation that a male student had assaulted another male student.  Id.  The data does not reflect a case where a female student allegedly assaulted a male student.  Id.  The University points out that the document in question contains "formal complaints of sexual assault adjudicated by the University from 2013/2014 to 2016/2017."  Defendant's Response at ¶ 2.  The Court's review of that document indicates that of the thirty-one sex-assault cases adjudicated during the period in question, thirty involved allegations by a woman that a man had assaulted her.  See dkt. # 63-8.  One case involved allegations that a man had attacked another man; one of the men complained.  Id.  Two cases involved allegations of sexual assault brought against a man by the University.  Id.

C.      **Procedures for Adjudicating Sexual Assault Claims at the University**

The Syracuse Student Conduct System Handbook contains a section entitled "Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence."  Plaintiff's Statement at ¶ 3.  In addition to other conduct, the policy prohibits harassment, sexual assault, and relationship violence.  Id.  The Sexual Misconduct Policy has a "Bill of Rights."  Id. at ¶ 4.  Included in these rights is the right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."  Id.  The Student Conduct System also guarantees each student "fundamental fairness."  Id.  The Syracuse policies do not "include the concept of 'innocent until proven guilty.'"  Id.  The University points out that the policies contain a statement that all students have "the right to written notice of the charges and a right to hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property

4

exists."  Defendant's Response at ¶ 4.

The Handbook defines "affirmative consent . . . as 'a knowing, voluntary and mutual decision among all participants to engage in sexual activity."  Id. at ¶ 5.  The policy further establishes that "'[c]onsent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent."  Id.  The policy addresses intoxication, stating:

> Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol . . . Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity.  Incapacitation may be caused by the lack of consciousness of being asleep, being involuntarily restrained, or if the individual otherwise cannot consent.  Depending on the level of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

Id. at ¶ 6.  The policy does not define "incapacitation," and the parties disagree about what the word means.  Id. at ¶ 7; Defendant's response at ¶ 7.  Plaintiff claims that, in practice, "incapacitation" means "impaired or 'very drunk.'" Plaintiff's Statement at ¶ 7.  Defendant contends that "[a] person is incapacitated when the person is not able to make decisions for themselves to consent to engagement in particular sexual activity."  Defendant's Response at ¶ 7.

The policy also establishes, Defendant points out, that "[t]he definition of consent does not vary based on a participant's sex, sexual orientation, gender identity, or gender expression."  Defendant's Statement of Material Facts in support of its summary judgment motion ("Defendant's Statement"), dkt. # 78-2, at ¶ 4.   In addition, consent to a prior sexual act does not "necessarily" indicate consent to any other act.  Id. at ¶ 5.  A person may

5

withdraw consent at any time.  Id. at ¶ 6.  The policy also provides that consent must be obtained when a person is under the influence of alcohol or drugs.  Id. at ¶ 7.

Citing to the testimony of Syracuse University Title IX investigator Bernerd Jacobsen, Plaintiff contends that "if two students engage in sexual activity where both are intoxicated to the point of incapacitation, both have violated" the policy.  Plaintiff's Statement at ¶ 8.[4] Defendant responds that Jacobsen answered the question in only a "hypothetical" sense, noting that the policy would permit such an outcome.  Defendant's Response at ¶ 8. According to the Defendant, "[t]here was no specific instance identified where that hypothetical circumstance actually occurred."  Id.

The policy provides that people who allege violations of the University's sexual misconduct policy should make complaints to the Title IX Coordinator.  Plaintiff's Statement at ¶ 9. The Title IX Coordinator can serve as a complainant and initiates claims on behalf of the alleged victim, and without the cooperation of that alleged victim.  Id.  The Title IX Coordinator designates an investigator upon receipt of a complaint.  Id. at ¶ 10.  The investigator "may" conduct an investigation.  Id.  Upon completion of a report, both the

_____

[4]Plaintiff cites the following passage from Jacobsen's deposition:

Q:   Now it's possible, I guess, for two parties to engage in sexual activity when both of them are substantially impaired; right?

A:   Yes.

Q:   I mean two people could be drunk at a party to the point that they're substantially impaired, they go back to someone's room, engage in sexual activity, and neither one has the ability to knowingly consent to the situation?

A:   Yes, I think that could be true.

Q:   And under the scenario I just described to you, they would both be then responsible under the Syracuse policy for sexual misconduct . . . [U]nder the policy, as you understand it, it seems likely they both would have violated the policy; right?

A:   I think in a straight reading of the policy, hypothetically, yes.

complainant and the respondent are permitted to review the report and provide a written response.  Id.  Both the complaining party and the party who responds are entitled to a procedural advisor of their choice throughout the investigation.  Defendant's Statement at ¶ 11.  The University contends that the final report from the investigator "describes the relevant facts learned but does not draw any conclusions or make any recommendations with respect to responsibility."  Id. at ¶ 15.  Plaintiff contends that the investigator had information that John Doe was intoxicated and "may have been incapacitated," but failed to report such "possible sexual misconduct to the Title IX Office or initiate an investigation into possible misconduct by Jane Roe."  Plaintiff's Response to Defendant's Statement ("Plaintiff's Response"), dkt. # 79-1, at ¶ 15.  The report also contained a "credibility assessment."  Id.

The University Conduct Board ("UCB"), which is made up of "trained faculty and staff members," adjudicates allegations of sexual misconduct.  Plaintiff's Statement at ¶ 10.  The policy permits that UCB to "rely on the investigator's report for its understanding of the relevant facts[.]"  Id.  The parties and their advisers are invited to meetings before the hearing to review the process the UCB will use.  Defendant's Statement at ¶ 17.  The UCB also invites the respondent and complainant to speak to the Board and provide additional information that the party finds relevant to the case.  Plaintiff's Statement at ¶ 10.  The UCB uses a preponderance of the evidence standard in determining whether the respondent violated the policy.  Id.  The University notes that the UCB alone determines whether the responding party is responsible for violating Syracuse policy.  Defendant's Statement at ¶ 16.  The Board can rely on the investigator's report alone, but may also conduct interviews and gather information.  Id. at ¶ 18.  Both the complainant and the responding party may

appear before the Board and offer any information they deem "pertinent."  Id. at ¶ 19.  If the UCB finds the respondent violated the policy, the Board can impose a sanction, "up to and including expulsion."  Id. at ¶ 21.

Any party may appeal the decision of the UCB, but the grounds for such appeals are limited.  Plaintiff's Statement at ¶ 10.  Those grounds are: (i) new, previously unavailable information; (ii) procedural error occurred that detrimentally affected the hearing's outcome; (iii) errors in interpretation of University policy existed which were so substantial as to deny a party a fair hearing; and (iv) the sanction was "grossly inappropriate" given the conduct. Defendant's Statement at ¶ 23.  If one party appeals, the other party may offer a written response.  Id. at ¶ 24.  Three full-time faculty or staff members make up the Appeals Board. Id. at ¶ 25.  That Board must accept the UCB's findings unless the Appeals Board concludes that the findings were "arbitrary, capricious, or unfair."  Id. at ¶ 26.  The Senior Vice President and Dean of the Students reviews the Appeals Board's decision.  Id. at ¶ 27.

Syracuse operates as a "mandatory reporting school."  Plaintiff's Statement at ¶ 10. A mandatory reporting school requires employees who are aware that a student may have engaged in sexual misconduct to report that possible misconduct to the Title IX Office.  Id. The Title IX Coordinator has authorization to initiate an investigation and disciplinary proceedings against a student without receiving a formal complaint from an alleged victim. Id.

### D.    The Incident in Question

John Doe's expulsion came as a result of events that occurred in the early morning hours of September 14, 2016.  Id. at ¶ 13.  At that time, John Doe and Jane Roe engaged in sexual activity.  Id.  The two had exchanged text messages and agreed to meet at a party

at John Doe's fraternity house.  Defendant's Statement at ¶ 29.[5]  They both had reportedly

consumed alcohol before the party.  Id. at ¶ 30.  Plaintiff responds that the investigator did

not conduct a follow-up interview with Jane Roe after he spoke with John Doe, and he

interviewed a number of witnesses with no first-hand knowledge of the events.  Plaintiff's

Response at ¶ 30.[6]  Jane Roe told the investigator that she continued to consume alcohol at

the fraternity party.  Defendant's Statement at ¶ 31.  She took several "pulls" from a

"handle" of vodka.  Id.

      Plaintiff and Jane Roe kissed at the fraternity house and then returned to Plaintiff's

dorm room late on September 13, 2016.  Id. at ¶ 32.  The two engaged in "rough sex" on

---

[5]Plaintiff objects to any discussion of the underlying encounter on the grounds of relevance.  He contends that he:

> is asserting that the school's disciplinary proceedings produced an erroneous outcome in violation of Title IX.  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  The actual "guilt" or "innocence" of Plaintiff in terms of the allegations that he sexually assaulted Jane Roe is not relevant.  Under *Yusuf*, a Title IX claimant may challenge the accuracy of a disciplinary proceeding by "alleg[ing] particular procedural flaws affecting the proof." [*Id.*] at 715.  *See Doe v. Brown Univ.*, 210 F.Supp.3d 310, 313 (D. R.I. 2016) ("It is not the Court's role to determine the facts of what happened between" [the] accused student and alleged victim of sexual assault).  Plaintiff also objects that the claimed material fact is based on information in an investigative report that is unreliable hearsay.

Federal Rule of Evidence 401 provides that "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence to determining the action."  FED. R. EVID. 401.  Plaintiff is mistaken that evidence of the underlying incident is irrelevant to the questions in this case.  If the finder of fact is to determine whether the University discriminated against the Plaintiff in disciplinary proceedings based on a sexual encounter between Plaintiff and Jane Roe on September 14, 2016, that factfinder must understand the events that led to the investigation and disciplinary hearing.

[6]Plaintiff includes this passage in response to each of the Defendant's statements about the encounter between Doe and Roe.

two occasions in the dorm room.  Id. at ¶ 33.  The first encounter was several hours before the second.  Id.  Plaintiff responds that Jane Roe initially informed the investigator that the sex was consensual, and that nothing in the University's policy prohibits rough sex. Plaintiff's Response at ¶ 33.

Defendant contends that John Doe did not demonstrate any difficulty recalling or recounting all the events that led up to either of the sexual encounters.  Defendant's Statement at ¶ 34.  While Plaintiff disputes the relevancy of this statement, he does not appear to dispute the underlying facts.  Plaintiff's Response at ¶ 34.  Plaintiff remembers "the circumstances he claims constituted consent on Jane's behalf."  Defendant's Statement at ¶ 35.  Plaintiff again fails to dispute this claim, but insists that Roe at first called the sex consensual.  Plaintiff's Response at ¶ 35.  Defendant reports that Plaintiff described the sex between the two in "lurid" detail to the investigator.  Defendant's Statement at ¶ 36.  He told the investigator that he had "finished" on Roe's chest during the first act around midnight, and then again had sex with her between four and five in the morning.  Id.

Plaintiff told the investigator that he was "buzzed, not drunk, nor belligerent" at the time in question.  Id. at ¶ 37.  Jane Roe, by contrast, told the investigator that she had "virtually no memory of the events" in the dorm room because of her intoxication.  Id. at ¶ 38.  Plaintiff repeats his complaint that the investigator did not follow up with Roe after speaking with him.  Plaintiff's Response at ¶ 38.  Roe could remember kissing Plaintiff, but could not recall her clothes coming off or having sex with Plaintiff.  Defendant's Statement at ¶ 39.  Plaintiff points out that Roe at first told the investigator that the sex had been consensual.  Plaintiff's Response at ¶ 39.  Roe remembered feeling sharp pain when

Plaintiff bit her lip, but she only realized they had sex when she woke up the next day in Doe's bed, naked.  Defendant's Statement at ¶ 40.  Plaintiff ejaculated in Roe's vagina during the second sex act and Jane Roe used Plan B birth control as a result.  Id. at ¶¶ 41-42.  Jane Roe urinated in Plaintiff's bed at some point during the night.  Id. at ¶ 43.

The next morning, Jane Roe realized that she had a swollen lip and unexplained bruises on her chest.  Id. at ¶ 44.  Plaintiff contends that the investigator's inclusion of evidence of bruises on Roe's chest in his report represented "irrelevant and unduly prejudicial" information.  Plaintiff's Response at ¶ 45.[7]  Jane Roe sought medical attention for her injuries.  Defendant's Statement at ¶ 45.

John Roe was informed on October 12, 2016 that Jane Roe had lodged a complaint for relationship violence against him.  Id. at ¶ 46.  John Doe never filed a complaint of any kind against Jane Roe, and never asked anyone at the University to do so.  Id. at ¶ 47.  Plaintiff admits that he never filed a complaint or asked anyone to do so, but contends that during the investigation the investigator learned he had been intoxicated and that Roe's conduct may have violated the sexual misconduct policy.  Plaintiff's Statement at ¶ 48.  Since reporting is "mandatory" at Syracuse when an employee becomes aware that a student "may have engaged in sexual misconduct," Plaintiff contends, the investigator was obligated to report Roe's conduct to the Title IX Office.  Id.  Plaintiff does not deny that he "maintains, and has always maintained, that the sex between" the two "was consensual but 'rough.'" Defendant's Statement at ¶ 48.

_____

[7]The numbering of paragraphs in Plaintiff's Response is inaccurate after paragraph 40.  Plaintiff accidentally started a new paragraph after listing the allegations in Defendant's paragraph 40.  Because each of the Plaintiff's responses to subsequent paragraphs begins with the statement to which Plaintiff responds, Plaintiff's intent is clear.

Syracuse issued a no-contact order limiting contract between Plaintiff and Jane Roe. Id. at ¶ 49.  The order prohibited Plaintiff from remaining in a location where Roe was present.  Id.  The order was in accord with University policy and the New York Education Law.  Id.

On October 12, 2016, Jane Roe met with Bernerd Jacobsen. Plaintiff's Statement at ¶ 14.  Plaintiff claims that "Jacobsen made no effort to determine why Jane Roe delayed reporting or how the delay might have affected her credibility."  Id.[8]  Roe initially told the investigator that the sexual activity between the two was consensual.  Id. at ¶ 15.  An email from Jacobsen on October 12, 2016 stated that Jane Roe reported that the sexual activity was consensual.  Id.

The investigation produced text messages between Doe and Roe after the incident. Id. at ¶ 16.  Roe sent Plaintiff a message at 7:45 a.m. on September 14, 2016, and a series of exchanges occurred over the following day:

> Roe (7:45 a.m. Sept. 14):  Sorry I was kinda out of it but did we use a condom l[ast] n[ight] or like did you finish in me

---

[8]The University admits this allegation.  The source for Plaintiff's claim that Jacobsen did not attempt to investigate the delay is Jacobsen's deposition, in which the following questions were asked and answered:

> Q:   So in your experience as an investigator, what is the significance of a delay in reporting?
> A:   I don't draw significance from a delay.  Some students report almost immediately; some delay sometimes extensively.
> Q:   Is delay a factor that you take into account in assessing credibility?
> A:   Not in assessing the credibility of the party bringing the complaint.  Delay renders an investigation a little more difficult sometimes.
> Q:   Is one of the things that you try to do as an investigator is figure out the reason for the delay in reporting?
> A:   Not typically, no.

| | |
|---|---|
| Doe: | We didn't use a condom. |
| Roe: | Did you finish inside me |
| Doe: | Yeah |
| Roe: | Like do I need plan b? |
| Doe: | Are you on birth control?  Cause if you aren't its probably better to be safe |
| Doe (10:08 a.m): | Sorry about last night because I was pretty out of it too. Just let me know what you end up doing and if you need anything |
| Roe: | I am on b[irth] c[ontrol] but like I've never let anyone finish like that<br>I'm sure I'm fine<br>Do you regret last night? |
| Doe: | Again I'm sorry . . I just know that last night wasnt the smartest because we were both way too drunk to make that decision |
| Roe: | You regret it? |
| Doe: | I don't necessarily regret it but I jsut feel bad that we were both so drunk |
| Roe: | Ok same I just didn't know if you were mad at me or something<br>I d[on't] k[now] how it happened while we were hooking up but I woke up with a lot of bruises. |
| Roe (4:57 p.m.): | hey I think I"m going to get plan b and it's super expensive and I would really appreciate some help paying for it |
| Doe (6:05 p.m.): | Yeah is it cool if I give u half |
| Roe (7:05 p.m.): | Yeah it was $50 |
| Doe: | Ok I don't have any cash on me do you mind if I venmo you? |
| Roe: | Yeah that's totally fine<br>I'm so sorry like I would never want to put you in this weird position |
| Doe: | no don't be I feel the same way |
| Roe (2:25 p.m. 9/15/16): | Hey there's something I wanna talk about |
| Doe: | Whats up |
| Roe: | Do you remember having sex<br>Like all of it or most of it |
| Doe: | Some of it<br>Why |
| Roe: | Because I woke up with bruises<br>So I went to the doctor today and the cartilage in my chest is crushed |
| Doe: | Wow ok thats kinda crazy.  I don't remember a ton but im pretty sure it wasn't like rough if thats what youre asking |
| Roe: | The only parts I remember were when it was rough |

Doe:                    Im sorry i didnt realize it was rough. If i had known i totally
                        wouldn't have done that
                        Im really sorry im in class right now can we talk more later
                        Are you ok though?
                        i am sorry you got hurt, i honestly didn't realize it was
                        hurting you, and you know i would never do anything to
                        intentionally hurt you.  more importantly, I'm sorry if i
                        made you feel like you couldn't tell me i was hurting you
                        whenever it [sic]

Exh. O to Plaintiff's Motion, dkt. # 63-17.

Plaintiff contends that these text messages "did not indicate that the sexual activity was not consensual."  Plaintiff's Statement at ¶ 16.  Defendant disputes that the text messages provide proof that the sex between Doe and Roe was consensual.  Defendant's Response at ¶ 16.  Defendant argues that the messages show that "Jane Roe was incapacitated to the point that she was not even aware of whether or not John Doe wore a condom."  Id.  Defendant also contends that John Doe, by contrast, "had near perfect recall and informed Jane Roe that he did not wear a condom and 'finished' inside her."  Id.

Plaintiff contends that Jacobsen admitted that he could not make a sexual assault case against Doe because Roe "could not testify that she did not consent to sexual activity with John Doe."  Plaintiff's Statement at ¶ 17.  He points to the following exchange between his lawyer and Jacobsen:

Q:    Did [Roe] at any point during the interview say to you 'I did not consent to
      sexual activity?
A:    I don't believe so.
Q:    She simply said she couldn't remember; right?
A:    Right.
Q:    And as a lawyer, you understand the difference between saying I don't
      remember and saying something happened; right?
A:    Yes.
Q:    It's a very important difference in the law; right?
A:    Absolutely.
Q:    Okay.  Based on someone saying you can't remember, you can't meet your

14

burden of proof, for example; right?

A:      Potentially.

Id. at ¶ 17 n.20.  Defendant disagrees, pointing out that the question was hypothetical, and not about this particular case.  Defendant's Response at ¶ 17.  Moreover, Defendant contends, Jacobsen's answer was that he "theoretically" could not prove a case based on such testimony, not that he could not prove his case in this matter.  Id.

Roe told Jacobsen that she had bruises after her encounter with the Plaintiff. Plaintiff's Statement at ¶ 18.  Plaintiff insists that Jacobsen testified that he could not make a case against Doe for relationship violence in causing those injuries because Roe could not testify that her injuries were the result of "rough sex."  Id.  Defendant responds that, while Jacobsen admitted that  the bruises were not necessarily evidence of a lack of consent, he also testified that Roe had told him that she would not have consented to the sort of sexual activity that resulted in the bruises she had.  Defendant's Statement at ¶ 18.

Plaintiff contends that after Jacobsen concluded that he could not charge Doe with relationship violence because of Roe's difficulty remembering the incident, Jacobsen decided to shift the focus of his investigation to whether Roe was incapacitated and thus incapable of consenting to the sexual activity.  Plaintiff's Statement at ¶ 19.  Defendants insist that Jane Roe, not Jacobsen, changed the focus of the investigation.  Defendant's Response at ¶ 19.  Jane Roe, Defendant alleges, had initially reported a claim of relationship violence based on the bruising she suffered.  Id.  Only after "further reflection," Defendant alleges, did Roe conclude that the sex was not consensual due to her incapacitation.  Id.  Plaintiff alleges that Jane Roe's claim that the sex between the two was not consensual came when she "changed her story" on November 7, 2016 and started to

15

insist that drunkenness made her incapacitated and unable to consent.  Id. at ¶ 20.
Defendant responds that Jane Roe had "consistently" reported gaps in her memory on the
night in question.  Defendant's Response at ¶ 20.  She could not recall having sex with the
Plaintiff.  Id.  Defendant contends that her failure to recall events "is consistent with the fact
that the sex was not consensual as she was incapacitated due to alcohol consumption."  Id.

Plaintiff claims that evidence gathered in the investigation indicated that John Doe
had been intoxicated and unable to consent to sexual activity.  Plaintiff's Statement at ¶ 21.
Text messages from the next day, he claims, shows that both he and Roe were intoxicated
when they had sex.  Id. at ¶ 22.  Despite knowledge of Doe's intoxication, Plaintiff points
out, Syracuse's Title IX office did not instigate a sexual misconduct investigation of Jane
Roe, and did not consider whether she had also violated that policy.  Id. at ¶ 23.  Defendant
responds that Doe had told the investigator that he was "buzzed, not drunk, nor belligerent."
Defendant's Response at ¶ 21.  According to the Defendant, Doe "has always maintained
the sex was 'rough' but consensual."  Id.  As to the text messages, Defendant contends, as
above, that the text messages indicate that Doe was much more aware of the events than
Roe was.  Id. at ¶ 22.  Further, Defendants contend, Jacobsen testified that, after speaking
with Plaintiff, calculating the amount of alcohol he had likely consumed, and examining
Plaintiff's "detailed statements," he "was not concerned that [Plaintiff] was incapacitated on
the night of that allegation.  And he didn't file a complaint."  Id. at ¶ 23.

Defendant contends that Jane Roe emailed University personnel "[a]fter several
weeks of what" she "described as 'self-reflection' and 'personal torment'" to state that she
had did not believe that the sex she had with Plaintiff was consensual.  Defendant's
Statement at ¶ 50.  She had initially considered the sex consensual, but had come to

16

conclude that her intoxication prevented her from consenting.  Id.  She had also not wanted

to report the sex as non-consensual because she considered John Doe a friend, and

because she had previously engaged in sexual activity with him.  Id. at ¶ 51.  Plaintiff insists

that Roe's motivation is not part of the record.  Plaintiff's Response at ¶ 52.  The

investigation report, however, contains a November 3, 2016 e-mail from the alleged victim,

addressed to Cory Wallack, her counselor and procedural advisor provided by the

University.  She states:

> After weeks of self-reflection and personal torment, I need to inform you of
> something I need to change in my personal statement.  Originally I told you the sex
> was consensual, because he and I had hooked up before.  But in reality, this was a
> lie I had told myself from the moment I walked home the next day.  I wanted to
> protect the boy who used to be my friend from taking the worst punishment he could
> and hold myself together.  I cannot do this any longer.  I know that the sex we had
> was absolutely not consensual: I was severely intoxicated, to the point of urinating in
> his bed.  I know that the way my chest was crushed, there would never have been a
> time I would have enjoyed or consented to the sex we had.  I know this is the first
> time those details came to light, and I apologize for that.  I genuinely thought I was
> doing the best thing for everyone but I can't do it anymore.

Exh. B. To Declaration of D'Antonio, dkt. # 78-5, at ECF p. 40.  Wallack did not have any

contact with Plaintiff between October 12, when she filed her initial complaint and

November 3, when she reported that the sex was not consensual.  Defendant's Statement

at ¶ 5.

The investigative report completed on December 6, 2016 included a credibility

assessment that suggested Jane Roe "presented as genuine and sincere."  Plaintiff's

Statement at ¶ 24.  The investigator had concluded that Jane Roe was "appropriately upset"

about the September 14, 2016 events.  Id.  Plaintiff contends that Jacobsen admitted,

however, that he "had no basis in" his "training and experience . . . to draw a conclusion

17

about what would be 'appropriate.'" Id.[9]  Defendant responds that Jacobsen testified that

he found Roe's reaction appropriate under the circumstances she had described.

Defendant's response at ¶ 24.  Defendant also contends that he testified he had received

training in assessing emotional reactions by complainants.  Id.  The report "suggested" that

Plaintiff's response should be viewed as offered by an accused, who had a "natural bias . . .

to present information in a light most favorable to himself."  Plaintiff's Statement at ¶ 25.

The University issued a No Contact Order that prohibited John Doe from contacting

Jane Roe.  Id. at ¶ 26.  The Order was designed to "prevent further negative reactions"

between the two.  Id.  Syracuse did not issue a similar order restraining Jane Roe.  Id.

Syracuse received information on November 10, 2016 that Roe had encountered Plaintiff at

a dining hall on campus.  Id. at ¶ 27.  Jacobsen observed in an e-mail that Plaintiff's actions

did not seem intentional.  Id.  The University did not investigate whether Doe had violated

the No Contact Order.  Id.

---

[9]In support of this statement, Plaintiff cites that following passage from Jacobsen's deposition:

> Q:   What is appropriately upset?
> A:   Her emotional reaction to what she was describing struck me as appropriate given the circumstances of what she was describing.
> Q:   So what is an appropriate reaction by a potential survivor of sexual assault?
> A:   It varies.
> Q:   And so you've received training in that; right?
> A:   Yes.
> Q:   What would be an inappropriate reaction?
> A:   I don't know what an inappropriate reaction would be.
> Q:   Have you ever included in your report that someone had an inappropriate presentation?
> A;   I don't know that I have.

Plaintiff's Statement at ¶ 24 n.27.

The University Conduct Board's hearing concerning the incident in question took place on January 20, 2017.  Id. at ¶ 28.  Plaintiff contends that Jane Roe's testimony before the Board addressed her intoxication on the night in question; she did not discuss the injuries she allegedly suffered during her encounter with Plaintiff.  Id. at ¶ 28(a).  Defendant points out that Roe testified that she consented to review of her medical records by the Board.  Defendant's Response at ¶ 28(a).  The Investigative Report also contained a summary of the medical records and photographs and diagrams of the bruising on her chest.  Id.  John Doe testified, but he was not able to "confront" any witnesses against him.  Plaintiff's Statement at ¶ 28(b).  The Board "was not provided with 'exculpatory' evidence," like an email from Jane Roe that Plaintiff claims indicates the sexual activity was consensual.  Id.  Defendant responds that the Policies and Procedures for the Board do not permit any party to confront adverse witnesses, and thus the hearing did not deny Doe a right made available to anyone else.  Defendant's Response at ¶ 28(b).  Moreover, the e-mail in question from Jane Roe is not exculpatory, but was an attempt to explain why she needed time to come to the realization that her intoxication prevented her from consenting. Id.  Plaintiff testified to the Board that the sexual activity was consensual, and that Jane Roe had initiated sexual activity by ripping off his shirt and pulling him into bed with her. Plaintiff's Statement at ¶ 28(c).  Defendant replies that Doe described the sex as consensual and "mutually aggressive."  Defendant's Response at ¶ 28(c).  The Board, Plaintiff claims, "focused on the fact that both students were intoxicated."  Plaintiff's Statement at ¶ 28(d).  Defendant responds that the testimony examined the parties' level of intoxication, but points out that Plaintiff never claimed to be incapacitated, but instead focused on Roe's alleged consent.  Defendant's Response at ¶ 28(d).

19

The Board found Plaintiff responsible for a violation of the University's Code of Conduct, a decision that Plaintiff found out about on January 26, 2017.  Plaintiff's Statement at ¶ 29.  The Board's judgment found that both parties had been drinking and that their judgment was "impacted."  Plaintiff's Statement at ¶ 30.  Defendant notes that the Board did not find Plaintiff to be incapacitated or unable to consent, and that he failed to receive affirmative consent from Jane Roe when he had sex with her.  Defendant's Response at ¶ 30.  The Board recommended expulsion.  Plaintiff's Statement at ¶ 31.  The University denied Plaintiff's appeal on February 14, 2017.  Id.  The University expelled him.  Id.

## II.     Legal Standard

Both parties have filed motions for summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party

opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.   Analysis

After explaining the standards for evaluating a Title IX claim alleging sex discrimination in the context of an administrative adjudication, the Court will address each parties' motion in turn, as appropriate.

### A.   Title IX

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities."  Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016).  "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"  Id. (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." Yusuf, 35 F.3d at 715. In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." Id. In the second, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Id. Under either theory, Plaintiff must plead and prove that "the complained-of conduct was discriminatory." Id. Thus, in order to establish a claim of discrimination under Title IX, Plaintiff must ultimately show that the defendant discriminated against him because of sex; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. Prasad v. Cornell Univ., No. 5:15-CV-322, 2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016)(internal quotation marks and citation omitted). The Court will address the separate standards for erroneous outcome and selective enforcement claims in addressing the parties' motions.

## B.    Plaintiff's Motion

Plaintiff seeks summary judgment on his "selective enforcement" claim. A "selective enforcement" claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender." Yusuf, 35 F.3d at 715. To prevail on such a claim, the Plaintiff must show: "1) similarly situated female students at [the University] were treated differently during investigations and disciplinary proceedings concerning sexual assault; and 2) the [Defendant] had the requisite discriminatory intent." Doe v. New York University, 2020 U.S.

Dist. LEXIS 19288 at *18 (S.D.N.Y. Feb. 5, 2020).[10]   Plaintiff argues that the Court should

grant him summary judgment because Jane Roe engaged in the same conduct that he did,

yet only he received any punishment for his conduct.  Plaintiff also contends that

Defendant's conduct in punishing him and not punishing Jane Roe came as a result of the

University's response to criticism from federal officials regarding misconduct on campus,

and out of an outdated understanding of gender roles and responsibility for sexual violence.

In the end, the Plaintiff contends that no reasonable juror could come to any conclusion but

that a bias against him, as a man, motivated Syracuse's finding that he alone had violated

_____

[10]The Second Circuit Court of Appeals has concluded that in pleading Title IX claims regarding university discipline, a plaintiff states a claim by "plead[ing] specific facts that support a minimal plausible inference of such discrimination."  Columbia Univ., 831 F.3d at 56.  Courts are to use the standard articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to evaluate the sufficiency of pleadings and evaluate the case.  The Second Circuit has described this standard as:

> In the initial phase of the case, the plaintiff can establish a prima facie case without evidence sufficient to show discriminatory motivation . . .  If the plaintiff can show (1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation, such a showing will raise a temporary "presumption" of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff.  However, once the employer presents evidence of its justification for the adverse action, joining issue on plaintiff's claim of discriminatory motivation, the presumption 'drops out of the picture' and the *McDonnell Douglas* framework is "no longer relevant."  At this point, in the second phase of the case, the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her

Columbia Univ., 831 F.3d at 54 (quoting Littlejohn v. City of New York, 795 F.3d 297, 307-308 (2d Cir. 2015)).  This case has now reached that "second phase."  Neither party has used this standard in addressing Plaintiff's motion for summary judgment.  Instead, Plaintiff simply argues that discrimination exists because the University did not punish Jane Roe for her conduct as Syracuse punished him.  The parties would do well to address the McDonnell Douglas standard as the case proceeds.

the sexual misconduct policy and the University's decision to expel him.  The Defendant responds that Plaintiff's motion ignores the University's policy on the role of intoxication in sexual misconduct cases, as well as the facts of the case.

The Plaintiff first argues that he and Jane Roe engaged in "the exact same sexual conduct."  Since they both admitted to drinking, they had both had sexual contact with a person incapable of consent, and both should have received the same sanction.  Jane Roe was not even investigated for violating the sexual misconduct policy.  This demonstrates gender bias, Plaintiff claims, and justifies awarding him summary judgment.  Plaintiff quotes portions of deposition testimony, notes that Syracuse administrators had acted to assist Jane Roe in processing the events of the evening in question while providing him no such aid, and never asked him if he wanted to pursue charges against Jane Roe.  The University's conduct demonstrates favoritism toward women and shows that Syracuse operates according to a "stereotypical view of males as sexual aggressors and females as passive," a view that men "are responsible for obtaining consent from" women, "but not the other way around."  This "archaic" attitude makes men constantly the aggressors in sexual relationships and leaves women as the ones who "give" consent.  Information produced in discovery reinforces this view, Plaintiff argues.  In a two-year period, Plaintiff points out, no sexual misconduct case involved a woman accused of assaulting a man.

The facts cited above indicate that a reasonable juror could conclude that the facts do not support Plaintiff's selective enforcement claim, and the Court will deny the motion in this respect.  Making all reasonable inferences in the University's favor, a number of facts are available which a reasonable juror could use to find that the University treated Plaintiff differently than Jane Roe for reasons unrelated to John Doe or Jane Roe's sex.  A

24

reasonable juror could conclude that Jane Roe was much more intoxicated than John Doe was, and that John Doe was capable of consenting to sex and Jane Roe was not.  Jurors could reach this conclusion by noting that John Doe responded to the University's investigation by contending that and Jane Roe both consented to the sexual activity, and neither was very drunk.  Those jurors could also consider that, by contrast, Jane Roe testified that she did not remember much of the evening, and that the parts she remembered included rough and aggressive activity from the Plaintiff which she complained about.  Her foggy memory also might help the jurors understand why she initially complained about injuries from the sex and then decided that she did not consent to the sex at all.  The fact that only Jane Roe complained of conduct that Plaintiff contended was normal and the object of enthusiastic consent from both parties could also lead a reasonable juror to conclude that the University charged only Plaintiff because the University believed that only Plaintiff was responsible.

The Court has also considered Plaintiff's argument that, under University policy and according to the statements of Syracuse officials during depositions, both parties had committed a violation and both deserved to be investigated.  That argument is unpersuasive.  The Court has examined the University policies and read all of the depositions.  A reasonable juror could come to a conclusion other than that university policies required charging both John Doe and Jane Doe for the incident.  Plaintiff has quoted selectively from the depositions.  In their fuller context, the depositions make clear that University officials understood that  consumption of alcohol, or even intoxication, does not automatically render a party incapable of consenting to sex.  The policy does the same. As explained above, the policy provides that a person who is "incapacitated" may be unable

25

to consent, and that drunkenness can lead to incapacitation. Plaintiff's position appears to be that drunkenness and incapacitation are equivalent under the policy.  Plaintiff is incorrect, and a reasonable juror could find a difference in his level of drunkenness and Jane Does.  That juror could conclude that Jane Doe was incapacitated and Plaintiff was not.  These facts do not require summary judgment for the Plaintiff.

Plaintiff may certainly argue at trial that the policy required an investigation of Jane Roe.  He can also argue that the University investigated only him because he was a man and Jane Roe a woman, but the facts of record do not require the Court to find that the only reasonable conclusion a juror could reach is that the University selectively enforced its sexual misconduct policy against him because of his sex.

Plaintiff also argues that he is entitled to summary judgment on his selective enforcement claim because the University's enforcement of sexual misconduct claims is driven by a bias against men cooked into the Title IX process by the Obama administration and by campus protests, as well as "archaic" attitudes towards male sexuality that cast men as natural predators and women as natural victims.  The Court is unpersuaded that this argument offers a basis by which to conclude that no reasonable juror could find for the Defendant on Plaintiff's selective enforcement claim.  First, in terms of pressure on the University to find against men because of Department of Education mandates and investigative cases brought against Syracuse, Defendant has produced no evidence beyond speculation that a fear of federal action influenced the University's actions in this case.  No evidence indicates that the University directed that men be singled out for investigation and punishment or that only women be considered potential victims.  The policies in question are gender-neutral.  Evidence of the Department of Education's policies and investigation

may not even be relevant or admissible at trial, though the Court reserves on that decision until an appropriate time.  For now, considering those policies and investigations does not persuade the Court that a reasonable juror could only include that the University's decision was affected by gender bias.

Second, while the evidence discussed above indicates that sexual misconduct claims at the University have almost always involved claims by women brought against men, the University could certainly argue that the vast majority of sexual assault claims are brought by women against men, and Syracuse statistics reflect that fact.  The University could also argue that Syracuse must take claimants as it finds them, and that its policies are neutral on their face.  Investigators take up the cases in front of them, and if more cases involve female complainants than men, investigators must investigate those cases.  While jurors might agree with Plaintiff that the procedures set up by Syracuse and the way that the University enforces those procedures reflects an unfair bias against men, jurors might also reject that position.  The Court cannot find that no reasonable juror could reject the University's position in this respect.  The issue is one for trial, not one to be resolved on summary judgment.

The case law upon which Plaintiff relies to support his motion is of no avail.  Plaintiff argues that he is entitled to summary judgment because courts have found that gender bias can exist when a party treats a man in a way that reinforces gender stereotypes.  He points to cases from other circuits, such as Oakstone v. Postmaster Gen., 332 F.Supp.2d 261, 271-272 (D.Me. 2004), where a district court rejected the defendant's argument that the sexual harassment the plaintiff allegedly suffered came not because of his sex but because the woman who supposedly harassed him was a former lover.  Id. at 269.  The Court

concluded that the harassment alleged came because of plaintiff's gender: the incident that gave rise to the claim occurred when the former lover claimed plaintiff had attacked her, a "charge . . . she knew would trigger an immediate and irreparable consequence for him due to a stereotype about his gender." Id. at 271-272.  Rachuna v. Best Fitness Corp., No. 1:13-cv-365, 2014 U.S. Dist. LEXIS 61674 (W.D.Pa. May 5, 2014), addresses whether a male employee could bring a claim for sexual harassment against a male supervisor who created a harassing environment based on stereotypes about male sexuality that offended the plaintiff.  The court denied a motion to dismiss that claim.  Id. at * 23.  Neither of those cases involve Title IX, neither establish that a selective enforcement claim can proceed on the basis of gender stereotypes, and neither granted judgment of any sort to the plaintiff. Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ., 397 F.Supp.3d 97 (D.Ma. 2019), addressed a Title IX claim, but at the motion-to-dismiss stage.   The court addressed a university policy that excluded students who joined single-sex organizations from becoming leaders in certain student organizations or athletic teams or receiving some scholarships. Id. at 101.  The Court concluded that plaintiffs had stated a claim for gender stereotyping and anti-male bias by alleging that the policy grew out of a bias towards all-male clubs on the basis that such clubs cause sexual violence and bigotry on campus, an attitude based on "stereotypes about how men and women should act." Id. at 108.  Plaintiff here does not bring that type of claim, and the Massachusetts court did not grant judgment to the plaintiffs.

Plaintiff also relies on Doe v. Miami University, 882 F.3d 579 (6th Cir. 2018), for the proposition that liability accrues to a university that chooses to investigate or discipline only the male student when a man and woman engage in sexual conduct which potentially violates the school's sexual misconduct policy.  In that case, Miami University disciplined

28

John Doe, who had engaged in sexual acts with Jane Doe, another student, after both had been drinking. Id. at 584. The plaintiff claimed "he was so intoxicated that he [could not] remember what occurred." Id. In speaking with investigators about the incident, plaintiff claimed that he could not remember the incident that led to the charges against him due to his intoxication. Id. at 585. The alleged victim, by contrast, provided a detailed account of the night in question; she alleged that what began as a consensual encounter changed after plaintiff had continued to touch her when she told him to stop. Id. at 585-86. Plaintiff brought a variety of Title IX and Section 1983 claims in the district court, and he appealed after the trial court granted defendant's motion to dismiss. Id. at 589. In evaluating plaintiff's Title IX claims, the Court considered four possible theories of liability available in the Sixth Circuit for a student challenging disciplinary proceedings: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions.'" Id. (quoting Doe v. Cummins, 662 F.App'x 437, 451-52 (6th Cir. 2016)). The Court found that plaintiff had stated a viable "erroneous outcome" claim by alleging "a pattern of gender-based decision-making and the external pressure on" the defendant to discipline more students for sexual violence, which "create[d] the plausible inference of intentional gender discrimination." Id. at 594. Plaintiff's claim did not state another viable Title IX theory.

The part of the case that plaintiff cites to for support of his summary judgment motion did not address a Title IX claim, but instead involved a Section 1983 equal protection claim. Id. at 595-96. The plaintiff argued that he had been treated unequally because he was disciplined for sexual misconduct while a woman involved in the same conduct was not. Id. at 596. The investigator had information that plaintiff had engaged in non-consensual

sexual acts against Jane Roe, but she also "allegedly knew that Jane had engaged in non-consensual acts against John," who "was so intoxicated he was unable to provide consent[.]" Id.  Neither student had "initiated a form complaint . . . regarding the other's conduct, but" the investigator "chose to pursue disciplinary action against John, but not Jane."  Id.  The court concluded that these alleged facts were sufficient to show that plaintiff had been treated differently from a similarly situated woman.  Id.  The court noted that "the exact alleged sexual misconduct of each student is not the same."  Id.  The plaintiff had allegedly "engaged in non-consensual digital penetration and oral sex" while Jane Roe, "apparently mostly sober, purportedly kissed John when he was incapacitated and unable to consent."  Id. at 596-97.  Still, the court had "not previously required a plaitniff to allege that the misconduct giving rise to an allegedly discriminatory outcome be of the same type and degree."  Id. at 597.  The unequal treatment came, the court found, when the University did not initiate any sort of investigation against Jane Roe, even though she had engaged in arguably nonconsensual activity.  Id.  While plaintiff would also need to prove that his different treatment was the result of intentional gender discrimination, at the motion to dismiss stage, he had pleaded sufficient facts.  Id.[11]

This case is not at the pleading stage, and the question before the Court is not whether Plaintiff has alleged facts sufficient to entitle him to relief if he proved them. *Plaintiff* has here moved for summary judgment.  Even assuming he is correct that he could

_____

[11]The court concluded "[o]f course this case is before us at the motion-to-dismiss stage, and discovery may disprove John's allegation that the reason he was treated differently than Jane was because of his gender and not because of other, legitimate reasons.  But given the procedural posture in which the case currently stands, however, we must presume John's allegations to be true."  Miami Univ., 882 F.3d at 597.

prevail if he showed that Syracuse did not charge Roe for the same conduct for which

Plaintiff suffered sanctions, he cannot show that no reasonable juror could find that the

University's different treatment of Plaintiff and his alleged victim was not motivated by sex

discrimination.  As explained above, such a juror could conclude that John Doe and Jane

Roe had different amounts of alcohol that evening, and that no evidence existed to lead the

investigator to conclude that Plaintiff was incapacitated and thus incapable of consent.

Moreover, unlike the Miami University case, Jane Roe here lodged a complaint and initiated

the investigation.  Plaintiff in this case never testified that he was incapacitated.  Granting

summary judgment to Plaintiff on these facts would be error.[12]

---

[12]Another case from the Sixth Circuit helps make this point.  In the Sixth Circuit, "[t]o prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender.'" Doe v. Univ. of Dayton, 766 Fed. Appx. 275, 284 (6th Cir. 2019) (quoting Doe v. Cummins, 662 F. App'x 437, 452 (6th Cir. 2016)).  At least one court in the Sixth Circuit has granted summary judgment to a *defendant* under similar circumstances.  In Doe v. Case Western Reserve Univ., 2019 U.S. Dist. LEXIS 745 at *38 (N.D. OH. May 1, 2019), the Plaintiff contended that his selective enforcement claim should proceed past summary judgment.  Plaintiff had been the subject of a sexual misconduct complaint from a fellow student who had engaged in a drunken sexual encounter with the Plaintiff.  Id. at *3-4. Plaintiff told an investigator that he had engaged in sexual conduct with the alleged victim in the basement of his fraternity house, acknowledging that she would probable not have gone with him had she been sober.  Id. at *7.  He could not "remember everything he did but . . . he sobered up when [the alleged victim] pushed him off her and started to cry."  Id. Plaintiff also "said the night was a blur[.]"  Id.  While he could remember some sexual activity, he could not remember all of it.  Id.  After an adjudicative process, the University suspended Plaintiff from campus until the alleged victim completed her degree.  Id. at *14. Plaintiff argued that "he was intoxicated, and under Doe v. Miami Univ., . . . [the University's] failure to pursue a similar charge against Jane Doe constituted gender bias."  Id. at *38.   While a deliberate-indifference Title IX claim did not require a valid comparator in the Sixth Circuit, a selective enforcement claim did.  Id. (citing Z.J. v. Vanderbilt Univ., 355 F.Supp.3d 646, 677 (M.D. Tenn. 2018)).  Given that requirement, the court found that:

Plaintiff has failed to identify a similarly situated female who was treated more favorably by CWRU when facing similar charges.  Until Plaintiff can make that

(continued...)

For all of the reasons stated above, Plaintiff's motion for summary judgment will be denied.

### B.   Defendant's Motion

Defendant moves for summary judgment on both Plaintiff's erroneous outcome and selective enforcement claim.  The Court will address each in turn.

### i.   Selective Enforcement

The Court has already explained the legal standard for a "selective enforcement"

---

[12](...continued)
showing, an inference of gender bias does not arise.  Jane Doe is clearly not similarly situated.  The only alleged similarity is that both students were intoxicated, but it is clear that all of the alleged sexual acts were initiated and performed by Plaintiff.  There is no allegation by Plaintiff that Jane Doe performed any sexual act on him with or without consent that could have led to a similar charge of non-consensual sexual intercourse.  As such, no inference of gender bias can be drawn and any selective enforcement claim fails.

Id. at *39.

While authority from the Sixth Circuit, whether from the Court of Appeals or a District Court, can only be persuasive authority in the Second Circuit, the Court would deny the motion even if the authority were binding.  As in Case Western, the Plaintiff here alleges that the fact that the student with whom he engaged in sexual conduct was also drinking and did not receive a similar sanction is evidence supporting a claim of selective enforcement.  The court in that case granted *defendant* summary judgment on that claim, finding  that the conduct of the individual accused mattered to whether the University had a basis for meting out different punishments, and that no reasonable juror could find that gender bias affected the defendant's disciplinary decision.  The court also reasonably concluded that the alleged victim was not a valid comparator, because her conduct was different from the plaintiff's.  The question before the Court here is easier, since the plaintiff moves for summary judgment in this respect.  Granting summary judgment to the Plaintiff under these circumstances would be to ignore every reasonable inference in the Defendant's favor, and would be error.  A reasonable juror could certainly conclude that the University's decision to punish the Plaintiff and not Jane Roe was reasonable under circumstances, sine any reasonable factfinder could conclude John Doe was capable of consenting and Jane Roe was not.

claim.  Defendant argues that Plaintiff cannot maintain such a claim because Jane Roe is

not a valid comparator because she had consumed considerably more alcohol than Doe

did, and because Doe testified that he could remember the incident clearly.  Doe is also

different from Roe, the University argues, because Doe never presented a disciplinary

complaint to Syracuse about the incident.

As explained above, there are questions of fact about whether gender bias motivated

the fact that Plaintiff received a penalty for the incident and Jane Roe did not.  Those are

questions for the jury to decide, and, for substantially the same reasons that the Court will

deny the Plaintiff's motion for summary judgment on this claim, the Court will deny the

Defendant's motion as well.

### ii.      Erroneous Outcome Claim

Defendant argues that the University is entitled to summary judgment on Plaintiff's

erroneous outcome claim.   To prevail on an erroneous outcome claim, Plaintiff must

"demonstrate (1) 'articulable doubt [as to] the accuracy of the outcome of the discipliiinary

proceeding,' and (2) that 'gender bias was a motivating factor behind the erroneous

finding.'" Doe v. Colgate Univ. Bd. of Trs., 760 Fed. Appx. 22, 30 (2d Cir. 2019) (quoting

Yusuf, 35 F.3d at 715).  Defendant argues that no evidence exists to establish that gender

bias motivated the disciplinary decision, or that the decision was "in any way erroneous."

The Court will address each element of the erroneous outcome claim in turn.

### a.      Articulable Doubt

Plaintiff insists that evidence exists to support the existence of an articulable doubt.

Congress did not intend "Title IX to impair the independence of universities in disciplining

33

students against whom the absence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement."  Yusuf, 35 F.3d at 715.  To establish such an "articulable doubt," the Plaintiff must point to evidence of "particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge."  Id.  A plaintiff can also point to "particular procedural flaws affecting the proof."  Id.

Plaintiff argues that the evidence demonstrates "several flaws in the investigatory process" that raise doubts as to the outcome of the investigation.  He contends that "bias" existed.  Plaintiff alleges that the evidence packet provided to the tribunal was not the evidence he had reviewed before the hearing.  Moreover, he contends, investigators operated on a presumption that he was an aggressor and Jane Roe a victim, and therefore resolved all doubts in her favor.  They did not confront Jane Roe with Plaintiff's claims that the sex was consensual or asked her to explain discrepancies between the two parties' accounts.  The investigator did not press Jane Roe about why she first called the sex consensual and later alleged that she had not consented.  Instead, Plaintiff claims, "[w]hen the female student [said] the sex is consensual, the investigator dug around to find . . . reasons it was not; when the male student says the sex was consensual, there is no further investigation."  Plaintiff also contends that the investigator did not follow up on information that indicated that Jane Roe may not have been injured in the encounter.  The investigator's credibility assessment also indicates such flawed process and bias; Plaintiff contends that at his deposition the investigator could not articulate why he found Jane Roe's discomfort with the situation "appropriate," and he seemed to assume that Plaintiff had a motive to lie.

34

Plaintiff also contends that the report before the University Conduct Board failed to include accurate information about Jane Roe's statements.

The Court finds that, making all inferences and resolving all factual disputes in Plaintiff's favor, Plaintiff has presented sufficient evidence of an articulable doubt as to the outcome of the disciplinary proceeding to survive summary judgment.  The evidence articulated, viewed in the light most favorable to the non-moving party, indicates that Plaintiff has raised an articulable doubt both about the conclusions the University Conduct Board made about the capacity of Jane Roe to consent to sexual conduct and the process used by the Board in reaching its decision.  A reasonable juror could find, based on Jane Roe's statements to the investigator, that she initially claimed that she had consented to the encounter and then offered a different explanation of the events.  That reasonable juror could also conclude that the process of the investigation focused on Roe's claims and failed to investigate Plaintiff's position fully.  The Court is partly guided by the Court of Appeals use of the word "articulable" as a modifier for "doubt."  "Articulable" may be defined as "capable of being expressed, explained or justified."  Merriam-Webster Dictionary, available at https://www.meriam-webster.com/dictionary/articulable (visited on April 22, 2020). The Plaintiff has pointed to evidence which a rational juror could find expresses, explains, or justifies doubts about the accuracy of the proceeding.   Summary judgment is not appropriate on this basis.

> **b.    Gender Bias**

As to gender bias as a motivating factor in the decision, the Defendant contends that Plaintiff has no evidence that such bias motivated the disciplinary decision in his focus on the federal investigations on campus or his claims that the on-campus atmosphere about

sexual violence led the University to punish him for his conduct.  Syracuse argues that none

of the witnesses involved in the investigation expressed more than a general awareness of

the Chancellor's Task Force on Sexual and Relationship Violence, and none were part of

the task force.  While these witnesses knew about protests about the closure of the

Advocacy Center or Sexual Assault Victims, they were not involved in the protests and saw

such protests as protests about resources, not outcomes.  No testimony indicated that any

of these investigations influenced the investigation of Plaintiff's case.

     To demonstrate gender bias as a motivating factor in the disciplinary decision, a

plaintiff must produce evidence of "particular circumstances suggesting that gender bias

was a motivating factor behind the erroneous filing."  Yusuf, 35 F.3d at 715.  Such evidence

can consist of "statements made by members of the disciplinary tribunal, statements by

pertinent university officials, or patterns of decision-making that also tend show the

influence of gender."  Id.  Such statements can serve both as evidence of gender bias as a

motivating factor and also create doubt as to the accuracy of the proceedings.

     Plaintiff contends that "there is evidence that Syracuse had been severely criticized

in the student body and in the public press for toleration of sexual assault of female

students."  Syracuse was also under investigation from the Department of Education.  While

Plaintiff admits that the mere presence of Office of Civil Rights investigations, "is not enough

to render a Title IX claim plausible,"[13] he argues that this evidence, combined with other

---

     [13]The Court notes that allegations sufficient to make a right to relief "plausible" is the standard the Court is to apply when deciding a motion to dismiss.  To survive a motion for summary judgment, Plaintiff must point to record evidence sufficient for a reasonable juror to decide that gender bias was a motivating factor in the disciplinary decision.  The cases cited by Plaintiff on this issue are of limited value to the Court's decision here, since they

(continued...)

evidence of gender bias, can be sufficient.

Plaintiff points to the two OCR investigations, but does not discuss their content and points to no evidence which connects the decision makers in this case to those investigations.  He contends that evidence produced in this case demonstrates a pattern at the University where men and women were treated differently for similar conduct.  He notes that:

> A chart produced by Syracuse in [d]iscovery shows that, for the years 2014-2015, every student accused of sexual assault was male.  In 2015-2016 there were three instances where the respondent was female, but in each of the instances where the respondent is female the complaint was also female.  In other words, in no case was there a female accused of sexual conduct against a male victim.  A Syracuse administrator testified that he was not "aware of any case in the past five years at Syracuse University where a female student was subject to discipline for engaging in sex with a male student."

Plaintiff contends that this evidence would be sufficient for a rational juror to conclude that gender bias was a motivating factor in the University's decision to expel him.

The Court finds that the evidence cited by the Plaintiff does not represent evidence by which a reasonable juror could conclude that gender was a motivating factor in the University Conduct Board's decision.  He points to no evidence that indicates that the members of the Conduct Board had any awareness of the investigations, or that they had any part in or agreement with a climate at the University that favored women over men in sexual misconduct investigations.  Plaintiff has not pointed to any directives from the University administration that encouraged or required adjudicators to view women's stories more favorably than men's.  He has not cited any evidence from these sources that

---

[13](...continued)
were cases addressing motions to dismiss, where the court considered the allegations in the complaint, not the evidence of record.

indicates a gender bias that had any impact on the outcome of the Conduct Board's decisions.   Whatever animus towards men that Plaintiff detects in the broader culture, he has not produced any evidence that such alleged animus shaped the decision of the Conduct Board.  The statistics he cites are also not evidence that the University acted with any particular animus.  While they demonstrate that a man was the respondent in nearly every sexual misconduct case, he does not point to any evidence indicating that the University refused to investigate or prosecute women.  He points to no evidence showing that this disparity in numbers was the result of any choice by Syracuse.   Moreover, while Plaintiff may articulate a doubt about the outcome due to the actions of investigators and counselors, he makes no effort to explain how gender motivated those differences.  He may be a man and Jane Roe a woman, but a difference in gender does not in itself constitute proof that gender bias motivated the investigatory decisions.  As such, Plaintiff has not met his burden in this respect, and the Court will grant Defendant's motion on the erroneous outcome claim.

**C.    Motion of the Syracuse Daily Orange**

The *Syracuse Daily Orange*, an independent student newspaper on the University campus, requests that the Court deny the University's request to seal certain documents related to this case.  The newspaper seeks to lift any sealing on Exhibit F to Plaintiff's motion for summary judgment, which contains statistics about sexual conduct complaints made to the University.  The newspaper also requests that the Court unseal letters from the parties requesting that the document remain sealed.

After the Plaintiff filed his motion for summary judgment, the University wrote the

Court requesting a conference on whether that document should be sealed.  See dkt. # 66.

After receiving the letter, the Court directed that the exhibit be temporarily sealed and

ordered the parties to submit letter briefs.  See dkt. #67.  The parties filed those briefs.

See dkt. # 68, 69.  The *Daily Orange* then submitted a letter request seeking leave to

intervene to oppose the sealing order.  See dkt. # 70.  The Court granted that request, and

the *Daily Orange* filed a letter articulating its position.  See dkt. #s 71, 75.

"The notion that the public should have access to the proceedings and documents of

courts is integral to our system of government."  United States v. Erie County, 763 F.3d 235,

238-239 (2d Cir. 2014).  That system of government, founded on the rights and input of the

people, requires "that the people themselves have the ability to learn of, monitor, and

respond to the actions of their representatives and their representative institutions."  Id. at

239.  The idea is an old one, "[i]ndeed, the common law right of public access to judicial

documents is said to predate even the Constitution itself."  Id.

There is a common-law right to access court information, but there is also a

constitutional one.  "[O]ur Constitution, and specifically the First Amendment to the

Constitution, also protects the public's right to have access to judicial documents."  Id. at

239.  That right is "stronger than its common law ancestor and counterpart."  Id.  Two tests

exist to determine whether the First Amendment right to access applies.  Under the first

approach, the First Amendment right attaches when "'experience and logic' support making

the document available to the public."  Id. (quoting Logusch v. Pyramid Co., 435 F.3d 110,

120 (2d Cir. 2006)).  The court is to "consider (a) whether the documents 'have historically

been open to the press and general public' (experience) and (b) whether 'public access

plays a significant positive role in the functioning of the particular process in question.'

(logic)." Id. (quoting Logusch, 435 F.3d at 120).  If the First Amendment applies, "documents 'may be sealed [only] if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Id.  The court's findings cannot be "'broad and general.'" Id.

While narrower, the common-law right of access to the courts is also important. Courts have been clear that "[t]he common law right of public access to judicial documents is firmly rooted in our nation's history."  Logusch v. Pyramid Co., 435 F.3d 110, 119 (2d Cir. 2006).  This right exists because:

> The presumption of access is based on the need for federal courts, although independent–indeed, particularly because they are independent–to have a measure of accountability and for the public to have confidence in the administration of justice. Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke.  Although courts have a number of internal checks, such an appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior.  Without monitoring, moreover, the public would have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.  Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)).

The common-law right attaches when the court finds "that the documents at issue are indeed 'judicial documents.'" Id.  Not all papers filed with the court qualify; "[i]n order to be designated a judicial document, 'the item filed must be relevant to the performance of the judicial function and useful in the judicial process.'"  Id.  If such documents are jducial documents, "a common law presumption of access attaches[.]" Id.  The court still must, however, "determine the weight of the presumption."  In doing so, a court is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant

40

value of such information to those monitoring the federal courts.  Generally, the information will fall somewhere on the continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.'"  Id. (quoting Amodeo, 71 F.3d at 1049).  The final step for the court is to "'balance competing considerations'" against access.  Id. (quoting Amodeo, 71 F.3d at 1050).  "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'"  Id. (quoting Amodeo, 71 F.3d at 1050).

The exhibit is a six-page document that lists formal complaints of sexual assault and misconduct at Syracuse from 2013-2017.  See dkt. # 63-8.  The document lists the date of the formal complaint, and is divided into fifteen columns for each formal complaint.  Id.  The file lists the case number, the date of the incident, the type of complaint, the gender of the complaint and the respondent (unless the University was the complainant), and the date of the complaint letter.  Id.  That document also includes the section of the Code of Conduct the student allegedly violated, whether the complaint was amended after the charge letter was issued, and the findings of the UCB.  Id.  Another set of columns identifies the investigator, the members of the three-member conduct board, and whether any party took an appeal.  Id.  Finally, the document lists the members of the Appeals Panel, if any, and the punishment assigned.  The document does not contain the name of any complainant or respondent, the location of any incident, or the specific details of any charge.  The document names only investigators, UCB panel members, and appellate panel members.

The University argues that even though the document does not identify any students, the document should remain sealed "to protect higher values that far outweigh the public's

interest in, or right to see, this sensitive information." Publishing the information, the University claims, would discourage future sexual assault and abuse victims from pursuing formal charges. Though no names are provided, Syracuse claims that the information in the document would permit others to identify the students involved in the charges. Finally, the University argues that naming the faculty members on the adjudicatory and appeals would discourage future participation.

The Court first finds that these sorts of documents are judicial documents that enjoy a presumption of public access "under both the common law and the First Amendment." Logush, 435 F.3d at 126. As this document has played a role in the Court's determination of the parties' summary judgment motions, the presumption in favor of public access to the document is a strong one. Amodeo, 71 F.3d at 1049-50. That presumption can, of course, be overcome when "'countervailing factors' in the common law framework or 'higher values' in the First Amendment framework so demand." Logush, 435 F.3d at 124.

Defendant contends that protecting the identity of sexual assault victims serves such a higher value. Not only are there privacy concerns related to such information, but the University also expresses concerns that identifying the victims would cause future victims to reconsider reporting sexual misconduct and undermine public safety on campus. Encouraging parties to report sexual assaults and other sexual misconduct is certainly a higher value that the Court must be sure to protect, but the Court finds the documents, which do not identify any complainant or any other student involved in the process, does not present a sufficient risk of discouraging reporting to require sealing of the information. The University uses statistical information to argue that most victims of campus sexual assault, especially after drinking, do not report such incidents. That is an unfortunate reality of

University life, but information contained in a table that does not include the names of any student does not appear to the Court to be likely to discourage reporting.  It certainly does not appear to discourage reporting to a degree significant enough to overcome the public's right of access to evidence the Court used in deciding summary judgment motions.   The Court will not seal the document on that basis.

While the University admits that no names of complainants or respondents are listed in the documents, Syracuse argues that information about the date of the assault and the existence of a formal complaint would permit those people who were aware of the underlying activity to work out that a formal process had occurred and undermine the strict confidentiality that the University assigns to such complaints.  Persons with such knowledge could determine the names of the responding party, the claimant, or any witness from the information provided.  While the Court agrees that protecting the identity of the those involved in sexual misconduct allegations represents a "higher value," the Court finds that the document in question does not unreasonably risk identification of those parties.  A person with knowledge of the incident may be able to work out that a formal complaint occurred and who was involved, but such persons already have knowledge of the underlying incident.  Nothing in the information provided in the summaries would permit the general public or anyone without prior knowledge of the incident to discern the identity of the parties.  The Court cannot make a specific, on the record, finding that the stated privacy concern outweighs the public's right to access of the document, particularly given that the document excludes the names, birth dates, addresses, or any other identifying information of either the complainant or the respondent.  The Court declines to seal the document on that basis.

The University also contends that faculty and staff members would be discouraged from serving on the UCB and Appeals Boards if their names were reported in this document.  The public, the University claims, could develop "a 'scorecard' of all of their specific decisions, as their names and roles in the process are not shielded or de-identified in any way."  The University fears that it would become difficult to recruit faculty and staff to sit on such boards if the names of people on those boards were made public.  The Court will here make a specific, on-the-record finding that releasing the names of faculty and staff members who rendered the decision in question does present a significant concern about protecting the integrity of the adjudicatory process that outweighs to public's need to know this information.  The Court used the information in the charts as a way of understanding the gender of those accused of misconduct, the University's role in bringing and prosecuting such cases, and the sorts of outcomes those cases had.  The Court also agrees that faculty and staff would be less likely to volunteer to resolve cases–which are emotional and can become controversial–if they could not keep their names out of public discussion.  Since the University and members of the University community have an interest in the functioning of the adjudicatory process, the Court finds that redacting the names of the panel members would serve the higher interest of the disciplinary process.  The public will also be able to understand the evidentiary basis for the Court's decision without such information.

As a result, the Court will grant letter motion of the *Daily Orange* in part and deny it in part.  The Court will order that the document be unsealed after the Plaintiff redacts the names of the faculty and staff members involved on the UCB and Appeals Panels for all of the cases listed on the document.

IV.     CONCLUSION

For the reasons stated above, the Plaintiff's motion for partial summary judgment, dkt. # 63, is hereby DENIED.  The Defendant's motion for summary judgment, dkt. # 78, is hereby GRANTED in part and DENIED in part.  The motion is GRANTED with respect to Plaintiff's erroneous outcome claim and DENIED with respect to Plaintiff's selective enforcement claim.  The motion for public access, dkt. # 72, of Intervenor the *Syracuse Daily Orange* is hereby GRANTED in part and DENIED in part.  Plaintiff shall provide a redacted version of docket entry # 63-8 to the Court which redacts the names of faculty and staff members participating in decisions of the University Conduct Board and Appeals Panels listed in that document within fourteen days of the date of this Order.  Once the Plaintiff presents that redacted document and the Clerk confirms that all such names have been redacted, the Clerk shall replace the existing docket entry # 63-8 with the redacted document and lift the seal on that docket entry.

**IT IS SO ORDERED.**

Dated:    April 30, 2020

Thomas J. McAvoy
Senior, U.S. District Judge

45